Filed 3/17/21  Kivel v. McInerney CA4/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SCOTT KIVEL et al., | D074173 |
| Plaintiffs, Cross-defendants and Appellants, | (Super. Ct. No. 37-2016-00028099) |
| v. | |
| PATRICK MCINERNEY et al., | |
| Defendants, Cross-complainants and Appellants. | |

APPEALS from judgment and orders of the Superior Court of San Diego County, Katherine Bacal, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Scott N. Kivel, in pro. per., and for Plaintiff, Cross-defendant, and Appellant Lia Lund.

1

Schwerdtfeger Law Group, Sean D. Schwerdtfeger and Catherine L. Coughlin for Defendants, Cross-complainants, and Appellants.

Defendants Patrick McInerney (Patrick), McInerney & Co, Inc. (M&C), McInerney & Associates, Inc. (M&A), and McInerney Architects (together Defendants) appeal a judgment finding M&C and Patrick liable for reimbursement under Business and Professions Code section 7031, subdivision (b)[1] (§ 7031(b)) for amounts plaintiffs Scott Kivel and Lia Lund (Plaintiffs) paid to M&C for construction of a single family residence, and a postjudgment order adding M&A as a judgment debtor. The trial court found that M&C was not a licensed contractor at all times when it performed services for Plaintiffs that required a contractor's license. On appeal, Defendants contend that the trial court erred by: (1) granting Plaintiffs' motion for summary adjudication of their section 7031(b) cause of action against M&C; (2) granting Plaintiffs' motion for a nonsuit on Defendants' cross-claims for compensation for architectural services provided to Plaintiffs by M&C and Patrick and instructing the jury that Patrick was not a licensed architect when he performed services for Plaintiffs that required an architect's license; (3) finding that Patrick was liable for the judgment amount as an alter ego of M&C; (4) granting Plaintiffs' request to add, and amending the judgment to add, M&A as a judgment debtor, as a successor corporation to M&C; and (5) awarding Plaintiffs attorney fees pursuant to Code of Civil Procedure section 1029.8 (§ 1029.8). Plaintiffs cross-appeal, contending that the court erred by denying their request for an award of

---

[1] All statutory references are to the Business and Professions Code unless otherwise specified.

prejudgment interest pursuant to Civil Code section 3287, subdivision (a) (§ 3287(a)).

We conclude that the trial court erred by awarding Plaintiffs attorney fees pursuant to section 1029.8 and denying Plaintiffs' request for prejudgment interest pursuant to section 3287(a). Accordingly, we reverse the judgment and orders to that extent, affirm them in all other respects, and remand the matter with directions that the court issue a new order and enter a new judgment reflecting our decision.

## FACTUAL AND PROCEDURAL BACKGROUND

In June 2013, Plaintiffs hired M&C, a corporation wholly owned by Patrick, to design a new single-family residence for a property that Plaintiffs had recently purchased in La Jolla. At that time, neither M&C nor Patrick was licensed in California to perform architectural services.[2]

In March 2014, Plaintiffs and M&C agreed that M&C would serve as Plaintiffs' general contractor in the construction of their new residence. At that time, neither M&C nor Patrick was licensed in California to perform contractor services. M&C then began performing general contractor services, including soliciting bids from subcontractors, hiring a subcontractor, and filing a permit application for the demolition or deconstruction of the existing residence on the property. In the fall of 2015, with construction of the new residence not yet complete, a dispute arose between Plaintiffs and M&C, which led to M&C's discontinuation of its general contractor services on Plaintiffs' new residence.

---

[2]    Patrick was apparently registered at that time as an architect in the United Kingdom.

3

In August 2016, Plaintiffs filed the instant action against Defendants, alleging causes of action for: (1) disgorgement of architect's fees; (2) disgorgement of contractor's fees; (3) breach of architect contract; (4) breach of construction contract; (5) negligence; (6) intentional misrepresentation; (7) breach of fiduciary duties; and (8) accounting. In September, Defendants filed a cross-complaint against Plaintiffs. In October, Defendants filed their operative amended cross-complaint, alleging causes of action for: (1) breach of oral design contract; (2) breach of oral construction contract; (3) quantum meruit - design services; and (4) quantum meruit - construction contract.

Plaintiffs filed a motion for summary adjudication on the second cause of action of their complaint as to only M&C and on the second and fourth causes of action of Defendants' amended cross-complaint. The court issued an order granting Plaintiffs' motion for summary adjudication, finding that there were no triable issues of material fact regarding whether M&C was licensed as a contractor at all times during its performance of contractor services and that M&C was not so licensed at all times. The court therefore found that under section 7031(b), Plaintiffs were entitled to reimbursement (or disgorgement) of all amounts that they had paid to M&C for construction services and materials.

During November and December 2017, a jury trial was conducted on the remaining causes of action of Plaintiffs' complaint and Defendants' amended cross-complaint. During trial, Plaintiffs moved for a judgment of nonsuit on Defendants' first and third cross-claims. The court granted Plaintiffs' motion and thereafter instructed the jury that Patrick had performed architectural services without a California architect's license. The jury returned a special verdict, answering 42 questions on the remaining

4

causes of action alleged in Plaintiffs' complaint and Defendants' amended cross-complaint. In particular, the jury found that M&C had breached its construction contract with Plaintiffs and overcharged Plaintiffs by $325,000. The jury also found that there were no construction defects and rejected Plaintiffs' causes of action against Defendants for negligence, intentional misrepresentation, and breach of fiduciary duty. In a bifurcated bench trial, the court subsequently found that Patrick was an alter ego of M&C and therefore, personally liable for the judgment amount. Plaintiffs subsequently elected the remedy of reimbursement under their section 7031(b) cause of action in lieu of the damages awarded by the jury for their cause of action for breach of the construction contract.

On February 28, 2018, the trial court entered judgment for Plaintiffs and against M&C and Patrick in the amount of $2,732,627.87 on Plaintiffs' section 7031(b) cause of action, reflecting the total amount paid by Plaintiffs to M&C. The court subsequently awarded Plaintiffs attorney fees in the amount of $155,008.50 and costs in the amount of $52,689.13. The court also granted Plaintiffs' motion to add M&A as a judgment debtor. The court denied Plaintiffs' request for an award of prejudgment interest pursuant to section 3287(a). On January 25, 2019, the court entered a second amended judgment against M&C, Patrick, and M&A for a total amount of $2,940,325.50. That judgment did not award Defendants any relief on their amended cross-complaint.

Defendants filed notices of appeal challenging the February 28, 2018 judgment, the August 3, 2018 order awarding Plaintiffs attorney fees, and the January 25, 2019 second amended judgment. Plaintiffs filed a notice of cross-appeal challenging the November 9, 2018 order denying their motion for prejudgment interest.

5

DISCUSSION

*DEFENDANTS' APPEAL*

I

*Order Granting Plaintiffs' Motion for Summary Adjudication
of Their Section 7031(b) Cause of Action*

Defendants contend that the trial court erred by granting Plaintiffs' motion for summary adjudication against M&C on Plaintiffs' second cause of action for reimbursement under section 7031(b) for amounts they paid to M&C for construction services and materials.  In particular, Defendants argue that a motion for summary adjudication is unavailable under Code of Civil Procedure section 437c, subdivision (f)(1) (§ 437c(f)(1)) unless the motion disposes of the cause of action against *all* defendants and not just a single defendant.  They also contend that the court erred by finding that there were no triable issues of material fact as to Plaintiffs' second cause of action and the second and fourth causes of action of Defendants' amended cross-complaint and that Plaintiffs were entitled to summary adjudication on those causes of action.

A

*Section 7031 generally*.  The Contractors State License Law (CSLL) (§ 7000 et seq.) "is a comprehensive legislative scheme governing the construction business in California.  [It] provides that contractors performing construction work must be licensed unless exempt.  [Citations.]  'The licensing requirements provide minimal assurance that all persons offering such services in California have the requisite skill and character, understand applicable local laws and codes, and know the rudiments of administering a contracting business.  [Citations.]'  [Citation.]  The [CSLL is] designed to

6

protect the public from incompetent or dishonest providers of building and construction services. [Citation.]" (*White v. Cridlebaugh* (2009) 178 Cal.App.4th 506, 517 (*White*).)

The CSLL's "statutory scheme encourages licensure by subjecting unlicensed contractors to criminal penalties and civil remedies. [Citation.] The civil remedies 'affect the unlicensed contractor's right to receive or retain compensation for unlicensed work.' [Citation.] The hiring party is entitled to enforce these remedies through a defensive 'shield' or an affirmative 'sword.' [Citation.]" (*Alatriste v. Cesar's Exterior Designs, Inc.* (2010) 183 Cal.App.4th 656, 664 (*Alatriste*).) "The *shield*, contained in section 7031(a), was enacted more than 70 years ago, and provides that a party has a complete defense to claims for compensation made by a contractor who performed work without a license, unless the contractor meets the requirements of the statutory substantial compliance doctrine. [Citation.]"[3] (*Alatriste*, at pp. 664-665, fn. omitted.) Section 7031, subdivision (a) (§ 7031(a)), the "shield" provision, currently provides:

> "[N]o person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action, or recover in law or equity in any action, in any court of this state for the collection of compensation for the performance of any act or contract where a license is required by this chapter without alleging that [he or she] was a duly licensed contractor at all times during the

---

[3] Section 7031, subdivision (e), "the substantial compliance exception, provides relief only in very narrow specified circumstances . . . ." (*Alatriste*, *supra*, 183 Cal.App.4th at p. 665.) Because Defendants do not assert on appeal that the substantial compliance exception applies in this case, we do not discuss its provisions or its potential application to the performance of contracting acts by M&C.

7

performance of that act or contract regardless of the merits of the cause of action brought by the person . . . ."

"The California Supreme Court has long given a broad, literal interpretation to section 7031(a)'s shield provision. [Citation.] The court has held that section 7031(a) applies even when the person for whom the work was performed *knew* the contractor was unlicensed. [Citation.]" (*Alatriste, supra,* 183 Cal.App.4th at p. 665.) In *MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412 (*MW Erectors*), the court stated: "[S]ection 7031(a) bars a person from suing to recover compensation for *any* work he or she did under an agreement for services requiring a contractor's license unless proper licensure was in place *at all times* during such contractual performance." (*Id.* at p. 419.) Because the Legislature has determined that the importance of deterring unlicensed persons from engaging in the contracting business outweighs any harshness between the parties, the bar of section 7031(a) applies regardless of the equities. (*Id.* at p. 423.) "In denying recovery to unlicensed contractors courts have rationalized the harsh impact on some competent, but unlicensed, persons by deferring to the legislative determination that deterrence outweighs the cumulative effect of the penalty suffered by the contractor and the unjust enrichment obtained by the property owner." (*Executive Landscape Corp. v. San Vicente Country Villas IV Assn.* (1983) 145 Cal.App.3d 496, 498.)

"In 2001, the Legislature amended section 7031 to add a *sword* remedy to the hiring party's litigation arsenal. That sword remedy, contained in section 7031(b), currently reads: 'Except as provided in subdivision (e), a person who utilizes the services of an unlicensed contractor may bring an action in any court of competent jurisdiction in this state *to recover all*

*compensation paid to the unlicensed contractor* for performance of any act or contract.' " (*Alatriste, supra*, 183 Cal.App.4th at p. 666, italics added.) In *White*, the court concluded that the Legislature intended that section 7031(a) and section 7031(b) be interpreted in a consistent manner so that the same remedy applies regardless of whether the unlicensed contractor is the plaintiff or defendant. (*White, supra*, 178 Cal.App.4th at pp. 519-520; see also *Alatriste*, at p. 666.) "In short, those who have not paid [the unlicensed contractor] are protected from being sued for payment and those who have paid may recover all compensation delivered." (*White*, at p. 520.) Further, "section 7031(b) applies to allow full reimbursement even if the contractor obtained a license after he or she began performing the work." (*MW Erectors, supra*, 36 Cal.4th at p. 429, fn. 8; *Alatriste*, at p. 671.) "[S]ection 7031(b) provides a reimbursement right for all amounts paid to an unlicensed contractor if the contractor was unlicensed *at any time* during the performance . . . ." (*Alatriste*, at p. 669, italics added.) Because "the Legislature intended that section 7031(b) be a mirror image of section 7031(a), . . . section 7031(b) does not permit an offset for work performed after a license is obtained . . . ." (*Alatriste*, at p. 672.) "[T]he authorization of recovery of 'all compensation paid to the unlicensed contractor for performance of any act or contract' means that unlicensed contractors are required to return all compensation received without reductions or offsets for the value of material or services provided." (*White*, at pp. 520-521.) In addition, "under section 7031(b), a party is entitled to reimbursement for amounts paid to an unlicensed contractor even if the party knew the contractor was unlicensed." (*Alatriste*, at p. 668.) From an equitable viewpoint, the reimbursement remedy provided by section 7031(b) could therefore, under some circumstances, be considered draconian.

9

B

*Summary adjudication generally.* "Motions for summary adjudication are procedurally identical to motions for summary judgment [citation], and our review of rulings on those motions is de novo [citation]." (*Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1281, 1290 (*Dunn*).) Under section 437c(f)(1), "[s]ummary adjudication is warranted only if the motion completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty." (*Dunn*, at p. 1290.)

"The purpose of the law of summary judgment [or summary adjudication] is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).) *Aguilar* clarified the standards that apply to motions for summary judgment and summary adjudication. (*Id.* at pp. 843-857.) Generally, if all of the papers submitted by the parties show that there is no triable issue of material fact and that the " 'moving party is entitled to a judgment [or summary adjudication] as a matter of law,' [citation]" the court must grant the motion for summary judgment or summary adjudication. (*Id.* at p. 843.) *Aguilar* stated:

> "If a party moving for summary judgment [or summary adjudication] in any action . . . would prevail at trial without submission of any issue of material fact to a trier of fact for determination, then he should prevail on summary judgment [or summary adjudication]. In such a case, . . . the 'court should grant' the motion 'and avoid a . . . trial' rendered 'useless' by nonsuit or directed verdict or similar device." (*Aguilar, supra*, 25 Cal.4th at p. 855.)

On appeal, the appellant has the burden to show that the trial court erred in granting a motion for summary judgment or summary adjudication. (*Bains v. Moores* (2009) 172 Cal.App.4th 445, 455.)  It is therefore appellant's burden to affirmatively demonstrate error by showing that there are triable issues of material fact that preclude summary judgment or summary adjudication.  (*Ibid*.)  "On appeal after a motion for summary judgment [or summary adjudication] has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained."  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334; see *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767.)  "On appeal, we exercise 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment [or summary adjudication] as a matter of law.'  [Citation.]  'The appellate court must examine only papers before the trial court when it considered the motion, and not documents filed later.  [Citation.]  Moreover, we construe the moving party's affidavits strictly, construe the opponent's affidavits liberally, and resolve doubts about the propriety of granting the motion in favor of the party opposing it.' "  (*Seo v. All-Makes Overhead Doors* (2002) 97 Cal.App.4th 1193, 1201-1202.)  Although we generally review de novo, or independently, a trial court's ruling on a motion for summary judgment or summary adjudication, we apply the abuse of discretion standard in reviewing the trial court's rulings on a party's evidentiary objections.  (*Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 122; *Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694.)

C

*Procedural background.* The second cause of action of Plaintiffs' complaint alleged that in March 2014 Patrick represented to Plaintiffs that Defendants were general contractors duly licensed in California. It alleged that in April 2014 Plaintiffs entered into an oral contract with Defendants for construction of Plaintiffs' new single-family residence on their La Jolla property. It further alleged that because Defendants were not duly licensed contractors in California when they performed contractor services from March 2014 and thereafter, under section 7031 Defendants must disgorge all sums Plaintiffs paid them, "which amount is at least $2,732,627.87, plus interest."

Defendants' amended cross-complaint alleged causes of action against Plaintiffs for breach of oral construction contract (second cause of action) and quantum meruit based on the construction contract (fourth cause of action). Their second cause of action alleged that on or about April 30, 2014, M&C and Plaintiffs entered into an oral contract for M&C to provide general contracting services in the construction of Plaintiffs' new residence "on a cost plus contract basis" (i.e., costs of construction plus 15 percent). It further alleged that Plaintiffs breached the oral contract by failing to pay M&C for the construction services rendered and materials supplied, causing M&C damages of at least $764,000. Defendants' fourth cause of action alleged that the reasonable value of the materials and services provided by M&C to Plaintiffs for which Plaintiffs had not paid was at least $764,000 and that it would be inequitable to unjustly enrich Plaintiffs with materials and services in that amount.

Plaintiffs filed a motion for summary adjudication of their second cause of action against M&C and the second and fourth causes of action alleged against them in Defendants' amended cross-complaint. Plaintiffs argued that there were no triable issues of material fact as to their allegation that M&C did not hold a valid contractor's license at all times during its performance of their oral construction contract and therefore, M&C was liable under section 7031(b) for disgorgement of all compensation that Plaintiffs had paid to it. Plaintiffs likewise argued that there were no triable issues of material fact as to their allegation that M&C did not hold a valid contractor's license at all times during its performance of their oral construction contract and therefore, pursuant to section 7031(a), M&C could not maintain an action to recover compensation for its acts. In support of their motion for summary adjudication, Plaintiffs submitted a memorandum of points and authorities; declarations of Kivel, Lund, and their counsel Christopher A. Elliott; exhibits to those declarations; a separate statement of undisputed material facts; and a request for judicial notice.

In their separate statement of undisputed material facts, Plaintiffs asserted that it was undisputed that in March 2014 M&C requested bids for demolition of the existing home on Plaintiffs' property and for construction of their new home.[4] They asserted that demolition of the existing home began

---

[4] Plaintiffs also asserted that it was undisputed that on March 24, 2014, Patrick applied for a combination building permit for their new home. They also asserted that on April 3, 2014, M&C hired someone to excavate the gas line on Plaintiffs' property. In support of those assertions, Plaintiffs submitted an email dated April 1, 2014, from Patrick to Lund, in which he stated that he had met with SDG&E and had "organized for someone to be at the house tomorrow to unearth the gas line at the sidewalk and the meter." He stated that SDG&E would then return to the site to cut the gas line and stop the gas service at the sidewalk and remove the meter.

in April 2014. Plaintiffs asserted that on May 2, 2014, M&C sent them a "construction invoice" dated April 30, 2014, in the amount of $50,000, which they paid by a check dated May 8, 2014. They asserted that on May 9, 2014, a permit was issued in Patrick's name for demolition of the existing home. Importantly, Plaintiffs asserted that it was undisputed that M&C was not actively licensed as a contractor in California until May 22, 2014. Although Patrick obtained a California contractor's license in 2008, he placed his license on inactive status in 2012 and reactivated and reassigned it to M&C on May 22, 2014.

In support of their separate statement, Plaintiffs submitted exhibits, including an email dated March 30, 2014, from Patrick to Lund, updating her on deconstruction of the existing home and stating that he had received a reply from Israel at RRR Green Demolition (RRR) offering to reduce his price by $2,000, and that he had also asked Dirt Cheap Demolition to confirm that its bid included the perimeter walls in its pricing. Patrick stated: "It is likely we will sub-contract with RRR Green Demolition (Israel)" and that he had asked to meet Israel on the site the following Tuesday to review the work. Plaintiffs also submitted an email dated April 1, 2014, from Patrick to Lund in which Patrick stated that he had "received a revised bid from Dirt Cheap Demo (increased by $5K) and a revised bid from Israel (reduced by $3K). The two bids are now within $4K with Israel's work linking directly to the ReCon company. So *I plan to subcontract Israel to move this forward*." (Italics added.) Patrick also stated that he had "asked each of the subcontracting firms to provide time lines in respect to each item of work."[5]

---

[5] Plaintiffs also submitted an email dated April 13, 2014, from Patrick to Lund, stating that "[w]e have been organizing all the trades as we move into this new phase." Patrick also updated Lund on the status of the building

14

Plaintiffs also submitted an email dated May 2, 2014, from Patrick to Plaintiffs, attaching three invoices. Patrick explained that the third invoice was "an on-account payment to cover the first subcontractors, deconstruction, shoring, and site set-up." Plaintiffs submitted a copy of "Invoice No. 441F" from M&C to Plaintiffs, dated April 30, 2014, which was titled "Construction Invoice." That construction invoice was in the amount of $50,000, which was "[n]ow [d]ue," and stated:

> "On Account Payment of $50,000 for site-set [*sic*] up costs related to [the property].
>
> "Temporary Construction Fence
> "Temporary Toilet
> "Shoring (Subcontract)
> "Deconstruction (Subcontract)"

Plaintiffs also submitted a copy of a check dated May 8, 2014, in the amount of $50,000 from Kivel to M&C, which showed that it had been paid by Kivel's bank on May 15, 2014.

Plaintiffs submitted a copy of the demolition permit issued on May 9, 2014, by City to Patrick, as the permit holder, for demolition of the existing home and garage.[6] Plaintiffs also submitted Elliott's declaration, which

---

permit application that he had filed with the City of San Diego (City), explaining that the City was "running behind schedule" and that he had "worked through the weekend to answer all of the major issues." Patrick also stated that he had received a bid from a local solar firm and would review it and forward it to Plaintiffs.

[6]  Plaintiffs also submitted a copy of a City document, showing its approval on May 27, 2014, of the combination building permit to Patrick, as the permit holder, for construction of the new residence, and indicating that the application for the permit had been filed on March 24, 2014.

15

attached as exhibits documents produced by Defendants pursuant to Plaintiffs' requests for production served in their action against Defendants. Those exhibits included copies of bids from demolition subcontractors. On March 20, 2014, J.T.H, Inc. submitted separate bids for demolition of the existing house and garage and for the breaking and removal of all concrete. On March 20, 2014, RRR submitted separate bids for deconstruction of the existing house and garage and for removal of the hardscape (e.g., driveway, foundations, sidewalks, and retaining walls). On March 26, 2014, RRR submitted an additional bid for removal of the hardscape.[7] All of the foregoing subcontractor bids were submitted to Patrick. Elliott also attached a certification of records, dated April 14, 2017, from the custodian of records for the California Contractors State License Board, stating that Patrick was issued a Class B general building contractor's license on October 22, 2008, which was renewed as inactive on November 1, 2012, and became active and was reassigned to M&C on May 22, 2014.

In its opposition to Plaintiffs' motion for summary adjudication, M&C submitted a memorandum of points and authorities, arguing that there were triable issues of material fact that precluded summary adjudication. In particular, M&C argued that there were disputed facts regarding whether it had performed contracting services prior to the issuance of its contractor's license on May 22, 2014. In support of its opposition, M&C submitted a request for judicial notice of the application for a demolition permit signed by

---

[7]     Other documents produced by Defendants included bids dated March 26, 2014, and April 8, 2014, from a window and door installer (R.H. Fitch Incorporated) and a bid dated March 29, 2014, from an excavating company (Mike Lloyd Excavating, Inc.).

16

Patrick on May 7, 2014, identifying M&C as the permit holder and RRR as the demolition subcontractor.

M&C also submitted a separate statement responding to Plaintiffs' separate statement of undisputed material facts. In particular, M&C disputed that the existing home was to be demolished, asserting that it was instead to be deconstructed for salvage of many of its reusable materials, and asserted that Plaintiffs had instructed M&C to begin investigating deconstruction vendors in March 2014.[8] M&C disputed that deconstruction of the existing home began in April 2014, asserting instead that deconstruction by RRR began after the demolition permit was issued on May 7, 2014. M&C agreed with Plaintiffs' assertion that Plaintiffs had paid M&C $2,732,627.87 for materials supplied and services rendered in construction of their new home. M&C asserted that it did not begin working as a contractor prior to receipt of its license on May 22, 2014. However, M&C did not dispute that Patrick's contractor's license was placed on inactive status in 2008 and reactivated and reassigned to M&C on May 22, 2014. M&C also did not dispute that it was not a licensed architect when it performed services for Plaintiffs.

In its separate statement, M&C also asserted its own undisputed material facts, including that on March 20, 2014, RRR submitted a deconstruction proposal and that in April 2014 Plaintiffs decided that they wanted to use RRR to deconstruct the existing home. M&C also asserted

_____

[8] M&C also disputed that it applied for a combination building permit on March 24, 2014, asserting instead that it did not apply for such permit until May 27, 2014. M&C also clarified that it did not hire anyone to excavate the gas line, asserting instead that Patrick had met with SDG&E to locate the gas line.

17

that by April 2014, Plaintiffs had indicated that they wanted M&C to serve as their general contractor and Patrick informed them that he would do so, but that he would have to reactivate his contractor's license and transfer it to M&C before performing any general contracting services.

Also in support of its opposition, M&C submitted Patrick's declaration, which stated that the $50,000 construction invoice transmitted to Plaintiffs on May 2, 2014, was an "on-account payment [*sic*] for future construction site set up costs." His declaration also stated that on May 7, 2014, M&C submitted an application for a demolition permit identifying M&C as the permit holder and RRR as the contractor, and that on May 9, 2014, RRR "commenced deconstruction of the existing structure." Also in support of its opposition, M&C submitted declarations from Paul Benton, a licensed architect, and William M. Lyons, a licensed contractor.

In reply to M&C's opposition, Plaintiffs submitted a supplemental request for judicial notice and Elliott's supplemental declaration. In particular, Elliott's declaration stated that on August 1 and 2, 2017, his colleague Hayward Kaiser took Patrick's deposition in this case. A copy of excerpts from the deposition transcript were attached to the declaration. Kaiser asked Patrick at his deposition: "Did you charge a markup on the expenses and costs you paid in connection with the deconstruction of the old house?" Patrick asked Kaiser to repeat the question. Kaiser restated his question: "Did you charge a 15 percent markup on the costs [M&C] incurred on the deconstruction of the old house?" Patrick answered: "Yes." Kaiser then asked: "Do you think that was appropriate?" Patrick answered: "I do." Kaiser asked: "Why?" Patrick answered: "Because *I procured, managed, and paid for the deconstruction of the old house.*" (Italics added.)

18

Plaintiffs' supplemental request for judicial notice asked that the court take judicial notice of a certified copy of City's record of permit-related appointments for their property through May 28, 2014. That record reflected that a demolition permit was issued on May 9, 2014.[9]

On August 30, 2017, the trial court granted Plaintiffs' motion for summary adjudication and, in so doing, granted the parties' requests for judicial notice. The court stated:

> "[Patrick] is the president and sole shareholder of M&C. [Citation.] [Patrick] had a contractor's license that went inactive in 2012. [Citation.] On April 30, 2014, [P]laintiffs and M&C entered into an oral contract to provide general contracting services in connection with the home. [Citations.] On May 22, 2014, [Patrick] reactivated the license and reassigned it to M&C. [Citation.]
>
> "Under section 7031(a), . . . [t]he question . . . is whether there is any triable issue of material fact as to whether M&C was licensed at all times during contractual performance. There is not.
>
> "On April 30, 2014 . . . , M&C sent [P]laintiffs a construction invoice for $50,000 for 'site set-up costs' including a temporary construction fence, shoring and deconstruction. [Citation.] Engaging in 'administrative duties' such as 'soliciting and accepting payment,' are 'in the capacity of' a contractor[] and require a license. [Citation.] In other words, there was contractual performance -- not just execution -- before M&C was licensed.

---

9    That record also reflected that on March 18, 2014, a building permit application was submitted for a new single-family dwelling unit and on March 24, 2014, seven sets of drawings were submitted in support of that application. It further reflected that on May 27, 2014, the building permit for the new single-family dwelling unit was issued.

19

" . . . A 'contractor' includes 'any person, who *undertakes to* or offers to undertake to *or purports to have the capacity to undertake* or submits a bid' to construct, alter or repair any building. [Citation.] Thus, a valid license was required when [P]laintiffs were billed for construction work. The fact that the construction invoice also notes that some of the work will be subcontracted out is immaterial. 'The California courts have also long held that those who enter into construction contracts must be licensed, even when they themselves do not do the actual work under the contract.' [Citation.]

"M&C began soliciting bids for deconstruction of the existing house in March 2014. [Citation.] On May 7, 2014, [Patrick] submitted an application for a demolition permit listing [RRR] as the contractor. [Citation.] Deconstruction began on May 9, 2014. [Citation.] Contractors must be licensed when they hire subcontractors. [Citation.] [Patrick] testified that M&C was entitled to be compensated for deconstruction because he 'procured, managed, and paid for the deconstruction.' [Citation.] M&C acted as a contractor by soliciting bids for deconstruction, hiring [RRR] and applying for a demolition permit. The fact that [RRR] did the actual deconstruction work does not exempt M&C from licensing requirements.

" . . . Thus there is no triable issue of fact that M&C acted as a contractor during a portion of the relevant time without having a license. . . .

"Because M&C is not entitled to recover for the outstanding construction costs allegedly owed, it follows that [P]laintiffs are entitled to recover their construction costs. Accordingly, the motion for summary adjudication is granted."

After trial, Plaintiffs elected the section 7031(b) remedy of reimbursement under their second cause of action in lieu of the damages awarded by the jury for their cause of action for breach of the construction

20

contract. The court subsequently entered the second amended judgment for Plaintiffs and against M&C, Patrick, and M&A in the amount of $2,732,627.87 on Plaintiffs' section 7031(b) cause of action.

D

*Interpretation of section 437c(f)(1).* In asserting that the trial court erred by granting Plaintiffs' motion for summary adjudication against M&C on Plaintiffs' second cause of action for reimbursement under section 7031(b), which was alleged against all Defendants, Defendants initially argue that a motion for summary adjudication is unavailable under section 437c(f)(1) unless the motion disposes of the cause of action against *all* defendants and not just a single defendant. Defendants rely on the language of section 437c(f)(1), which provides:

> "A party may move for summary adjudication as to one or more causes of action within an action, one or more affirmative defenses, one or more claims for damages, or one or more issues of duty, if the party contends that the cause of action has no merit, that there is no affirmative defense to the cause of action, that there is no merit to an affirmative defense to any cause of action, that there is no merit to a claim for damages, as specified in Section 3294 of the Civil Code, or that one or more defendants either owed or did not owe a duty to the plaintiff or plaintiffs. *A motion for summary adjudication shall be granted only if it completely disposes of a cause of action*, an affirmative defense, a claim for damages, or an issue of duty." (Italics added.)

Defendants misconstrue the plain language of section 437c(f)(1) in arguing that a motion for summary adjudication must completely dispose of a cause of action against *all* defendants and not just as to a single defendant. To the contrary, there is no language in section 437c(f)(1) that requires that

summary adjudication completely dispose of a cause of action against *all* defendants.

In interpreting a statute, "our fundamental objective is to ascertain the legislative intent." (*Alatriste, supra*, 183 Cal.App.4th at p. 663.) We initially focus on the words of the statute because statutory language is generally the most reliable indicator of legislative intent. (*Ibid*.) The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context. (*Ibid*.; *MW Erectors, supra*, 36 Cal.4th at p. 426.) If the statutory language is unambiguous, we presume that the Legislature intended what it stated and the plain meaning of the statute governs. (*MW Erectors*, at p. 426.) On appeal, we independently review the legal question of the proper interpretation of a statute. (*Alatriste*, at p. 664.)

"Prior to the 1990 amendment to the summary adjudication statute, parties could seek summary adjudication on any issues raised in a case. The 1990 amendment limited summary adjudication motions to a cause of action, an affirmative defense, a claim for punitive damages, or an issue of duty. [Citation.] . . . The clear purpose of the amendment was to ' "stop the practice of adjudication of facts or adjudication of issues that do not completely dispose of a cause of action or a defense." ' [Citation.]"[10] (*Paramount*

_____

[10] In 1990, section 437c(f) was amended to provide in pertinent part that "any party may move for summary adjudication as to [a] cause or causes of action . . . ." (*Lilienthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848, 1851-1852 (*Lilienthal*).) In 1993, section 437c(f) was amended and renumbered as section 437c(f)(1), reading substantially as it reads today. (Stats.1993, ch. 276, § 1; see *Hood v. Superior Court* (1995) 33 Cal.App.4th 319, 323 [" 'A party may move for summary adjudication as to one or more causes of action . . . . A motion for summary adjudication shall be granted only if it completely disposes of a cause of action . . . .' "].)

*Petroleum Corp. v. Superior Court* (2014) 227 Cal.App.4th 226, 241-242 (*Paramount*).)

By its express language, section 437c(f)(1) allows "[a] party" to file a motion for summary adjudication, clearly indicating that a *single* plaintiff or defendant may file such a motion. Thus, in any action in which there are multiple plaintiffs or defendants, one plaintiff or one defendant may file a motion for summary adjudication. There is nothing in the language of section 437c(f)(1) that precludes a plaintiff or defendant from filing a motion for summary adjudication of a cause of action as to only one of multiple defendants or one of multiple plaintiffs. Further, section 437c(f)(1) provides that a party may file a motion for summary adjudication as to a cause of action if the party asserts, inter alia, "that *one or more defendants* either owed or did not owe a duty to the plaintiff or plaintiffs." (Italics added.) That language plainly indicates that summary adjudication may be granted in favor of, or against, "one or more defendants" if there is no triable issue as to whether one or more defendants owed a duty to the plaintiff or plaintiffs. (§ 437c(f)(1).) Based on the plain language of section 437c(f)(1), we conclude that the Legislature intended that summary adjudication of a cause of action may be granted against only one of multiple defendants named in that cause of action if there are no triable issues of material fact on that cause of action as to that defendant and the plaintiffs are entitled to judgment on that cause of action. (Cf. *Paramount*, *supra*, 227 Cal.App.4th at p. 243 [plaintiff can obtain summary adjudication of cause of action if plaintiff establishes each element of cause of action entitling plaintiff to judgment on that cause of action].)

Contrary to Defendants' assertion, there is nothing in the language of section 437c(f)(1) that requires all plaintiffs or all defendants to be either the

23

moving parties or opposing parties on a motion for summary adjudication of a cause of action. If Defendants' position were correct, we would expect that they could cite, or that our research would reveal, a published case so holding during the almost 30-year period since the current language of section 437c(f)(1) was enacted.[11] However, our research shows that courts have affirmed summary judgments and summary adjudications against one of multiple defendants or in favor of one of multiple plaintiffs. (See, e.g., *Lyons v. Security Pacific Nat. Bank* (1995) 40 Cal.App.4th 1001, 1006, 1023 [affirmed summary judgment in favor of one of two defendants]; *Orange County Water Dist. v. Sabic Innovative Plastics US, LLC* (2017) 14 Cal.App.5th 343, 417, fn. 38 [affirmed summary adjudication in favor of one of multiple defendants]; *Archdale v. American Internat. Specialty Lines Ins. Co.* (2007) 154 Cal.App.4th 449, 473 [affirmed summary judgment in favor of one of multiple plaintiffs].)

Further, Code of Civil Procedure section 579 provides: "In an action against several defendants, the court may, in its discretion, render judgment against one or more of them, leaving the action to proceed against the others,

---

11    Although Defendants cite *Lilienthal, supra,* 12 Cal.App.4th 1848, as their primary case in support of their position, that case is inapposite to this case and did not address the question whether a motion for summary adjudication may be granted against one of multiple defendants or one of multiple plaintiffs. Rather, *Lilienthal* concluded that because a cause of action alleged in the complaint in that case combined two separate and distinct claims (i.e., primary rights or theories of liability), the trial court erred by refusing to rule on the plaintiffs' motion for summary adjudication of one of the two claims that were, in effect, two separate causes of action. (*Id.* at pp. 1850, 1854.) Because *Lilienthal* is inapposite to the issue in this case, it does not persuade us to reach a contrary conclusion regarding our interpretation of section 437c(f)(1).

whenever a several judgment is proper." Although that statute does not expressly apply to a summary adjudication against one or more of several defendants, one can infer from its provisions that in enacting section 437c(f)(1), the Legislature did not intend to preclude a summary adjudication against one of multiple defendants. Accordingly, Defendants have not carried their burden on appeal to show that Plaintiffs could not properly file, and the trial court could not properly grant, a motion for summary adjudication of the complaint's second cause of action as to M&C only, and not as to all Defendants.

E

*No triable issues of material fact.* Defendants alternatively contend that the trial court erred by granting Plaintiffs' motion for summary adjudication because there exist triable issues of material fact as to the second cause of action of Plaintiffs' complaint and as to the second and fourth causes of action of Defendants' amended cross-complaint. In particular, Defendants argue that there are triable issues on the factual question of whether M&C performed contracting services prior to May 22, 2014, the date on which it became licensed as a contractor in California.

Section 7026 defines a "contractor" as "*any person who* undertakes to or offers to undertake to, or purports to have the capacity to undertake to, or submits a bid to, or *does himself or herself or by or through others*, construct, alter, repair, add to, subtract from, improve, move, wreck or *demolish any building* . . . or other structure, . . . or to do any part thereof . . . ." (Italics added.) As discussed above, section 7031(a) provides: "[N]o person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action, or recover in law or equity in any action, in any court of

this state for the collection of compensation for the performance of any act or contract where a license is required by this chapter without alleging that [he or she was] a duly licensed contractor at all times during the performance of that act or contract . . . ." Section 7031(b) provides: "[A] person who utilizes the services of an unlicensed contractor may bring an action in any court of competent jurisdiction in this state to recover all compensation paid to the unlicensed contractor for performance of any act or contract."

Section 7031(b) allows a plaintiff to recover "full reimbursement even if the contractor obtained a license after he or she began performing the work." (*MW Erectors*, *supra*, 36 Cal.4th at p. 429, fn. 8; *Alatriste*, *supra*, 183 Cal.App.4th at p. 671.) Importantly, "section 7031(b) provides a reimbursement right for all amounts paid to an unlicensed contractor if the contractor was unlicensed *at any time* during the performance . . . ." (*Alatriste,* at p. 669, italics added; see also *Judicial Council of California v. Jacob Facilities, Inc.* (2015) 239 Cal.App.4th 882, 896 (*Judicial Council*) ["[I]f a contractor is unlicensed for any period of time while delivering construction services, the contractor forfeits *all* compensation for the work, not merely compensation for the period when the contractor was unlicensed."].) Section 7031(b) does not permit an offset for work performed after a license is obtained. (*Alatriste,* at p. 672.) Unlicensed contractors are required to return all compensation received without reductions or offsets for the value of material or services provided. (*White*, *supra*, 178 Cal.App.4th at pp. 520-521.) Therefore, if M&C performed *any act* requiring a contractor's license prior to May 22, 2014, it is subject to the shield provisions of section 7031(a) and the sword provisions of section 7031(b).

Based on our review of the record, we conclude that there is undisputed evidence showing that M&C performed one or more acts that required a

contractor's license prior to May 22, 2014, when M&C obtained a California contractor's license. In particular, before May 22, 2014, M&C performed contracting acts related to demolition or deconstruction of the existing home on Plaintiffs' property. In March 2014, M&C requested and received bids from subcontractors for the demolition or deconstruction of the existing home, garage and hardscape. In support of their motion for summary adjudication, Plaintiffs submitted Elliott's declaration, which attached copies of bids from demolition subcontractors. On March 20, 2014, J.T.H, Inc. submitted separate bids for demolition of the existing house and garage and for the breaking and removal of all concrete. On March 20, 2014, RRR submitted separate bids for deconstruction of the existing house and garage and for removal of the hardscape (e.g., driveway, foundations, sidewalks, and retaining walls). On March 26, 2014, RRR submitted an additional bid for removal of the hardscape. Defendants do not dispute the authenticity of those bids.

Plaintiffs also submitted a copy of an email dated March 30, 2014, from Patrick to Plaintiffs updating her on deconstruction of the existing home and stating that he had received a reply from RRR offering to reduce its price by $2,000 and that he had also asked Dirt Cheap Demolition to confirm that its bid included the perimeter walls in its pricing. Patrick stated: "It is likely we will sub-contract with [RRR]" and that he had asked to meet with Israel of RRR on the site the following Tuesday to review the work. Defendants do not dispute the authenticity of that email or its substance showing that in March 2014 Patrick, on behalf of M&C, solicited bids from subcontractors for the demolition or deconstruction of the existing home and garage. Plaintiffs also submitted a copy of an email dated April 1, 2014, from Patrick to Lund in which he stated that he had "received a revised bid from Dirt Cheap Demo

27

(increased by $5K) and a revised bid from [RRR] (reduced by $3K). The two bids are now within $4K with [RRR]'s work linking directly to the ReCon company. So *I plan to subcontract Israel* [of RRR] *to move this forward.*" (Italics added.) Defendants do not dispute the authenticity of that email or its substance showing that on or before April 1, 2014, Patrick, on behalf of M&C, solicited bids from subcontractors for the demolition or deconstruction of the existing home and garage and, in addition, intended to subcontract with RRR for that demolition or deconstruction work.

In support of its opposition to Plaintiffs' motion, M&C submitted a request for judicial notice (which the trial court subsequently granted) of the application for a demolition permit signed by Patrick on May 7, 2014, identifying M&C as the permit holder and RRR as the demolition subcontractor. Plaintiffs submitted a copy of the demolition permit issued on May 9, 2014, by City to Patrick, as the permit holder, for demolition of the existing home and garage. M&C also submitted Patrick's declaration, stating that on May 9, 2014, RRR "commenced deconstruction of the existing structure." Importantly, Plaintiffs also submitted Elliott's supplemental declaration that attached an excerpt from Patrick's deposition in which Patrick stated: "*I procured, managed, and paid for the deconstruction of the old house.*" (Italics added.)

Based on the above undisputed evidence, it is clear that during the period from March 20, 2014, through May 9, 2014, M&C solicited bids from subcontractors, received bids from subcontractors, hired a subcontractor, and used a subcontractor to perform the acts of demolition or deconstruction of the existing home and garage, and that all of those acts by M&C occurred before May 22, 2014, when M&C received a contractor's license. Contrary to Defendants' assertion, the fact that RRR was listed on the demolition permit

28

as the licensed contractor for performance of the demolition work does *not* prove that M&C was not acting as a contractor when it solicited bids from and hired RRR as the subcontractor to perform that demolition work. Section 7026 includes in its definition of a "contractor" any person "who undertakes to . . . or does himself or herself or *by or through others*, construct, alter, repair, add to, *subtract from*, improve, move, *wreck or demolish any building* . . . or other structure . . . or to do any part thereof . . . ." (Italics added.) Therefore, when a person or entity such as M&C hires a subcontractor, such as RRR, to perform the act of demolition or deconstruction of (i.e., "subtract from") any building, that person or entity is acting as a contractor and must be licensed as a contractor to perform that act. (§§ 7026, 7031(a).) In *Vallejo Development Co. v. Beck Development Co.* (1994) 24 Cal.App.4th 929, at page 941, the court stated: "[B]oth the person who provides construction services himself and one who does so 'through others' qualifies as a 'contractor' [under section 7026]. The California courts have also long held that those who enter into construction contracts *must be licensed, even when they themselves do not do the actual work* under the contract." (Italics added.) Accordingly, there is no triable issue of material fact as to the question whether M&C performed contracting services by soliciting bids from subcontractors, and hiring and using a subcontractor, to perform demolition or deconstruction work on Plaintiffs' property prior to May 22, 2014, when M&C obtained its contractor's license.

In addition, there is undisputed evidence that prior to May 22, 2014, M&C performed contracting acts by submitting a construction invoice to Plaintiffs and accepting payment on that invoice. In support of their motion, Plaintiffs submitted an email dated May 2, 2014, from Patrick to Plaintiffs, attaching an invoice for "an on-account payment to cover the first

29

subcontractors, deconstruction, shoring, and site set-up." Plaintiffs submitted a copy of "Invoice No. 441F" from M&C to Plaintiffs, dated April 30, 2014, and titled "Construction Invoice." That construction invoice stated that the amount of $50,000 was "[n]ow [d]ue" and was for site set-up costs, including a temporary construction fence, a temporary toilet, a shoring subcontract, and a deconstruction subcontract. Plaintiffs also submitted a copy of their check dated May 8, 2014, in the amount of $50,000 to M&C, which showed that it was paid by Plaintiffs' bank on May 15, 2014.

In support of its opposition to Plaintiffs' motion, M&C submitted Patrick's declaration, which stated that the $50,000 construction invoice transmitted to Plaintiffs on May 2, 2014, was an "on-account payment [*sic*] for future construction site set up costs." However, the construction invoice does not limit those site set-up costs to only those costs incurred on or after May 22, 2014, when M&C obtained its contractor's license. Because Defendants do not dispute that demolition or deconstruction of the existing house and garage began on May 9, 2014, the only reasonable inference is that at least some portion of the demolition costs reflected on the April 30, 2014 construction invoice was incurred by M&C before May 22, 2014.[12] The evidence is therefore undisputed that on May 2, 2014, M&C sent an invoice to Plaintiffs for construction costs and Plaintiffs' $50,000 check in payment of that invoice cleared Plaintiffs' bank account on May 15, 2014. By carrying out such administrative duties as "soliciting and accepting payment" prior to

---

[12]    Similarly, it could be inferred that the initial set-up costs for a temporary construction fence and a temporary toilet were also incurred by M&C on or before May 9, 2014, when that demolition or deconstruction began, which was before May 22, 2014, when M&C obtained its contractor's license.

30

May 22, 2014, M&C engaged in the business of a contractor within the meaning of section 7026 before it obtained a contractor's license. (Cf. *Judicial Council*, *supra*, 239 Cal.App.4th at p. 905.) Accordingly, there is no triable issue of material fact as to the issue of whether M&C performed contracting services by submitting a construction invoice to Plaintiffs and accepting payment on that invoice prior to May 22, 2014, when it obtained its contractor's license.

Contrary to Defendants' assertion, the fact that some of M&C's services could alternatively be described as "design" services does not negate the fact that M&C performed acts requiring a contractor's license prior to May 22, 2014. In *Banis Restaurant Design, Inc. v. Serrano* (2005) 134 Cal.App.4th 1035 (*Banis*), the court addressed a construction contract entered into by an unlicensed contractor, which included compensation for certain design services to be provided by the unlicensed contractor, such as "drawings for electrical and plumbing plans [and] drawing plans for a reflected ceiling." (*Id*. at pp. 1040-1042, 1044.) The court concluded that those services constituted acts of a contractor under section 7026 and therefore, that section 7031(a) barred the unlicensed contractor's action for compensation. (*Banis*, at pp. 1042-1043; see also *WSS Industrial Construction, Inc. v. Great West Contractors, Inc.* (2008) 162 Cal.App.4th 581, 592 [applying *Banis* to unlicensed contractor's preparation of shop drawings].)

Based on the undisputed evidence that M&C performed acts requiring a contractor's license prior to May 22, 2014, when it obtained its contractor's license, the trial court correctly concluded that under section 7031(a) and section 7031(b) there were no triable issues of material fact regarding the second cause of action of Plaintiffs' complaint and the second and fourth causes of action of Defendants' amended cross-complaint, and that Plaintiffs

31

were therefore entitled to summary adjudication on those causes of action. (§ 437c(f)(1); *Aguilar*, *supra*, 25 Cal.4th at pp. 843, 855; *Dunn*, *supra*, 135 Cal.App.4th at p. 1290.)  None of the evidence cited by Defendants, including the conclusory declarations of their two experts that M&C's acts did not constitute acts requiring a contractor's license, persuades us to reach a contrary conclusion.  In particular, to the extent that M&C provided Plaintiffs with cost estimates and an estimated construction timetable before proceeding with their construction project, the undisputed evidence discussed above shows that M&C's acts prior to May 22, 2014 were *not* restricted solely to providing such purported cost and timetable estimate services.[13]

II

*Nonsuit on Defendants' Architectural Services Cross-Claims*

Defendants contend that the trial court erred by granting Plaintiffs' motion for a judgment of nonsuit on Defendants' cross-claims for compensation for architectural services provided by M&C and Patrick and by instructing the jury that Patrick was not a licensed architect when he performed services for Plaintiffs that required an architect's license.  In particular, Defendants argue that Patrick's services in designing an all-concrete accessory building were exempt from California's architectural licensing requirements.

---

[13]    Because we dispose of this issue based on our application of section 7031(a) and section 7031(b) to the undisputed evidence of M&C's contracting acts performed prior to May 22, 2014, as discussed above, we need not, and do not, address Plaintiffs' alternative contention that those statutes also entitled them to summary adjudication because M&C's contractor's license was automatically suspended under section 7125.2 for failure to carry worker's compensation insurance for its employees.

## A

The first and third causes of action of Defendants' amended cross-complaint alleged cross-claims for breach of an oral design contract and quantum meruit for design services. At trial, Patrick testified that the house and garage for which he designed plans were timber-framed (i.e., wood-framed), but the two-story annex or accessory building that he designed was made of "poured-in-place concrete." On conclusion of the evidentiary portion of the jury trial, Plaintiffs moved for a judgment of nonsuit on Defendants' first and third cross-claims. The court granted the motion, finding that the exemptions provided in section 5537 do not apply to exempt the services provided by Patrick to Plaintiffs in designing the concrete accessory building from California's architectural licensing requirements. The court also instructed the jury:

> "The Court has found that in performing design services for Plaintiffs' home, Patrick McInerney was performing architectural services for which a license was required and that Mr. McInerney did not have such a license."

After the jury returned its special verdict, the court, in a bifurcated trial, denied Plaintiffs' first cause of action for restitution of architecture fees paid to Defendants.

## B

An architect must be licensed by the State of California to perform architectural services in California. (§ 5500 et seq.; *Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 772-773.) An unlicensed person cannot recover consideration under a contract for, or the reasonable value of, any architectural services rendered. (§ 143, subd. (a); *Force v. Hart* (1930) 209 Cal. 600, 605.) Section 5537 provides an exception from licensing

requirements for architectural services performed relating to certain *woodframe* structures, stating:

> "(a) *This chapter does not prohibit any person from preparing plans*, drawings, or specifications for *any* of the following:

> "(1) *Single-family dwellings of woodframe construction* not more than two stories and basement in height.

> "(2) Multiple dwellings containing no more than four dwelling units of woodframe construction not more than two stories and basement in height. . . .

> "(3) *Garages or other structures appurtenant to buildings described under subdivision (a), of woodframe construction* not more than two stories and basement in height.

> "(4) Agricultural and ranch buildings of woodframe construction . . . .

> "(b) *If any portion of any structure exempted by this section deviates from substantial compliance with conventional framing requirements for woodframe construction* found in the most recent edition of Title 24 of the California Code of Regulations or tables of limitation for woodframe construction, as defined by the applicable building code duly adopted by the local jurisdiction or the state, *the building official* having jurisdiction *shall require the preparation of plans*, drawings, specifications, or calculations *for that portion by, or under the responsible control of, a licensed architect or registered engineer*. The documents *for that portion* shall bear the stamp and signature of the licensee who is responsible for their preparation. . . ." (Italics added.)

## C

Defendants assert that the trial court erred by granting Plaintiffs' motion for a judgment of nonsuit on the first and third causes of action of

34

Defendants' amended cross-complaint because the exception in section 5537 applied to allow Patrick and M&C, each of which was unlicensed as an architect in California, to design the construction plans for Plaintiffs' property, including a wood-framed single family residence and a two-story all-concrete accessory building, which were then certified by a licensed structural engineer. In particular, Defendants argue that section 5537, subdivision (b) applies to their design of the all-concrete accessory building.

As discussed above, in interpreting the meaning of a statute, we initially focus on the words of the statute because statutory language is generally the most reliable indicator of legislative intent. (*Alatriste*, *supra*, 183 Cal.App.4th at p. 663.) The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context. (*Ibid.*; *MW Erectors*, *supra*, 36 Cal.4th at p. 426.) If the statutory language is unambiguous, we presume that the Legislature intended what it stated and the plain meaning of the statute governs. (*MW Erectors*, at p. 426.) On appeal, we independently review the legal question of the proper interpretation of a statute. (*Alatriste*, at p. 664.)

Based on our independent review of the plain language of section 5537, we conclude that statute does *not* provide any exemption from California's architectural services licensing requirements for the design of an all-concrete accessory building. Section 5537, subdivision (a) provides exemptions from California's architectural services license requirements for the preparation of plans for four specified types of wood-frame structures. There are two types of wood-framed structures designed by Patrick for Plaintiffs that presumably are covered by section 5537, subdivision (a)'s exemptions: (1) the single family residence (§ 5537, subd. (a)(1) ["[s]ingle-family dwellings of woodframe construction"]); and (2) the wood-framed garage (§ 5537, subd. (a)(3)

35

["[g]arages or other structures appurtenant to buildings described under subdivision (a), of woodframe construction"]). However, the plain language of section 5537, subdivision (a) does not set forth any exemption for an all-concrete building.

Further, the plain language of section 5537, subdivision (b) does *not* apply in this case to provide any exemption from California's architectural services licensing requirements for Patrick's design of Plaintiffs' all-concrete accessory building. Section 5537, subdivision (b) applies only to the four specified structures exempted under section 5537, subdivision (a). Importantly, section 5537, subdivision (b) begins with the prefatory phrase: "*If any portion of any structure exempted by this section* [i.e., section 5537, subdivision (a)] *deviates from* substantial compliance with conventional framing *requirements for woodframe construction . . . .*" (Italics added.) By its plain language, section 5537, subdivision (b) applies *only if* there is *any portion of a structure of woodframe construction* exempted in section 5537, subdivision (a) that does not substantially comply with requirements for woodframe construction. Accordingly, section 5537, subdivision (b)'s provisions apply *only if* the structure in question is made in part of woodframe construction and in part of non-woodframe construction (e.g., concrete). Section 5537, subdivision (b) is thus plainly inapplicable to an all-concrete structure, such as the two-story all-concrete accessory building designed by Patrick in this case. Because Patrick and M&C were not licensed as architects in California and section 5537 did not apply to exempt their design of Plaintiffs' all-concrete accessory building from licensing requirements, we conclude that the trial court correctly granted Plaintiffs' motion for a judgment of nonsuit on the first and third causes of action of

36

Defendants' amended cross-complaint.[14]  Further, based on the reasoning above, we conclude that the court properly instructed the jury that Patrick performed architectural services for which a license was required and that he did not have such a license.  Defendants do not cite any case or other authority persuading us to reach a contrary conclusion.[15]

III

*Patrick's Alter Ego Liability*

Defendants contend that the trial court erred by finding that Patrick is liable for the judgment amount as an alter ego of M&C.  In particular, Defendants argue that there is insufficient evidence to support the court's

---

[14]  Although the parties have not raised the issue on appeal, we presume that under section 143, subdivision (a), an unlicensed architect, like an unlicensed contractor under section 7031(b), generally cannot obtain compensation for services performed if any part of a project requires a license.  (Cf. *Banis*, *supra*, 134 Cal.App.4th at pp. 1046-1047 [because work performed by unlicensed contractor that required license was part of integrated whole, § 7031(a) precluded recovery by unlicensed contractor for both part of work that required license and part of work that did not require license]; *WSS Industrial Construction, Inc.*, *supra*, 162 Cal.App.4th at pp. 591-592 [same].)

[15]  Assuming, for purposes of argument, that the trial court erred by granting Plaintiffs' nonsuit motion and by instructing the jury as described above, we nevertheless would conclude that Defendants have not carried their burden on appeal to affirmatively show that those errors were prejudicial under the standard of review set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (i.e., that it is reasonably probable Defendants would have obtained a more favorable result if the errors had not occurred).  (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069; *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800; *Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296, 308-310.)

finding that if the acts of M&C were treated as those of the corporation alone, an inequitable result would follow.

A

The alter ego doctrine is an equitable doctrine, which one court described as follows: "A corporate identity may be disregarded--the 'corporate veil' pierced--where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation. [Citation.] Under the alter ego doctrine, then, when the corporate form is used to perpetuate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the equitable owners. [Citations.]" (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538 (*Sonora Diamond Corp.*).)

"In California, two conditions must be met before the alter ego doctrine will be invoked. First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone. [Citations.]" (*Sonora Diamond Corp.*, *supra*, 83 Cal.App.4th at p. 538.) "Whether a party is liable under an alter-ego theory is normally a question of fact. [Citations.] 'The conditions under which the corporate entity may be disregarded, or the corporation be regarded as the alter ego of the stockholders, necessarily vary according to the circumstances in each case inasmuch as the doctrine is essentially an equitable one and for that reason is particularly within the province of the

38

trial court.' [Citation.]" (*Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 811 (*Zoran*).)

"The first requirement for disregarding the corporate entity under the alter ego doctrine--whether there is sufficient unity of interest and ownership that the separate personalities of the individual and the corporation no longer exist--encompasses a series of factors. Among the many factors to be considered in applying the doctrine are one individual's ownership of all stock in a corporation; use of the same office or business location; commingling of funds and other assets of the individual and the corporation; an individual holding out that he is personally liable for the debts of the corporation; identical directors and officers; failure to maintain minutes or adequate corporate records; disregard of corporate [or legal] formalities; absence of corporate assets and inadequate capitalization; and the use of the corporation as a mere shell, instrumentality or conduit for the business of an individual. [Citation.] This list of factors is not exhaustive, and these enumerated factors may be considered with others under the particular circumstances of each case. ' "No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine." ' [Citation.]" (*Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1073 (*Misik*).)

"The second requirement for application of the alter ego doctrine is a finding that the facts are such that adherence to the fiction of the separate existence of the corporation would sanction a fraud or promote injustice. [Citation.] The test for this requirement is that if the acts are treated as those of the corporation alone, it will produce an *unjust or inequitable result*. [Citation.]" (*Misik, supra*, 197 Cal.App.4th at p. 1073, italics added.) "Application of the alter ego doctrine does not depend upon pleading or proof of fraud." (*Engineering Service Corp. v. Longridge Inv. Co.* (1957) 153

Cal.App.2d 404, 415 (*Engineering Service Corp.*).) "It is enough if the recognition of the two entities as separate would result in an injustice." (*Gordon v. Aztec Brewing Co.* (1949) 33 Cal.2d 514, 523 (*Gordon*); see also *Automotriz del Golfo de California S.A. de C.V. v. Resnick* (1957) 47 Cal.2d 792, 796 (*Automotriz*).)

On appeal, we apply the substantial evidence standard in reviewing a trial court's finding that the alter ego doctrine applies. (*Wolf Metals Inc. v. Rand Pacific Sales, Inc.* (2016) 4 Cal.App.5th 698, 703 (*Wolf Metals Inc.*); *Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1248; *Alexander v. Abbey of the Chimes* (1980) 104 Cal.App.3d 39, 46-47.) In applying the substantial evidence standard of review, we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—to support the finding of fact. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Cochran* (2002) 103 Cal.App.4th 8, 13.) The substantial evidence standard of review involves two steps. "First, one must resolve all explicit conflicts in the evidence in favor of the respondent and presume in favor of the judgment all *reasonable* inferences. [Citation.] Second, one must determine whether the evidence thus marshaled is substantial. While it is commonly stated that our 'power' begins and ends with a determination that there is substantial evidence [citation], this does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment. . . . [Citation.] '[I]f the word "substantial" [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any"

evidence. It must be reasonable . . . , credible, and of solid value . . . .'
[Citation.] The ultimate determination is whether a *reasonable* trier of fact
could have found for the respondent based on the *whole* record." (*Kuhn v.
Department of General Services* (1994) 22 Cal.App.4th 1627, 1632-1633, fns.
omitted.)

## B

Before trial, Plaintiffs filed a trial brief, arguing that all Defendants
were alter egos of each other and should therefore be found liable on the
causes of action alleged against them. The parties agreed that the issue of
alter ego liability would be tried by the court at a bifurcated hearing after the
jury trial. After the jury returned its special verdict against M&C, the court
heard Plaintiffs' request to add Patrick, M&A, and McInerney Architects as
judgment debtors, as alter egos of M&C. The court granted the request as to
Patrick and denied it as to M&A and McInerney Architects. The court stated:

> "The Court finds [Patrick] is in fact an alter ego of [M&C].
> The Court notes it is not making that finding just because,
> as [Patrick] testified, he was the sole officer, director,
> shareholder and employee of [M&C]. [Patrick] also notes
> that [M&C] and [Patrick] shared a home office computer
> and CPA.
>
> "It notes that moneys [*sic*] appear to have been diverted
> from [M&C] for [Patrick's] individual use. Moneys [*sic*]
> were not kept separate. Corporate formalities were not
> honored. There was no evidence of adequate capitalization.
>
> "Furthermore -- and this was not argued by the parties, but
> the Court considered the fact that [Patrick] testified that he
> kept separate calendars and diaries for the separate
> entities and work. No such diaries and calendars were ever
> produced. As a result, I am construing that evidence
> against the defendant.

41

"On the question of bad faith, the Court notes that all of the acts of [M&C], in particular, the act of acting as an architect, were taken individually by [Patrick]. The court finds that this is sufficient in this case to support alter ego. It rises to the level that it would be inequitable to allow the corporate formalities to prevent individual liability against [Patrick]. The Court finds further the responsible corporate officer doctrine supports this result."

The court imposed alter ego liability on Patrick on all causes of action and included him as a judgment debtor in the initial judgment and the second amended judgment.

C

Defendants contend that there is insufficient evidence to support the trial court's finding that Patrick was an alter ego of M&C and that he should therefore be held liable for the full amount of the judgment awarded against M&C. Based on our review of the record, we conclude that there is substantial evidence to support the court's finding that both requirements for alter ego liability were satisfied.

On the first requirement, we conclude that there is substantial evidence that there was "such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist." (*Sonora Diamond Corp.*, *supra*, 83 Cal.App.4th at p. 538.) As Patrick testified, and other evidence admitted at trial showed, Patrick was the sole shareholder, sole director, sole officer, and sole employee of M&C. M&C's business office was located at Patrick's home. Patrick and M&C shared the same accountant. Importantly, the evidence showed that Patrick commingled M&C's funds with his personal funds and used M&C's funds to pay his personal expenses.

42

Plaintiffs presented the testimony of Jennifer Ziegler, a forensic accountant, who stated that about $500,000 in credit card charges were paid from M&C's bank subaccount for Plaintiffs' project for expenses that were not for Plaintiffs' project. Also, Patrick testified that he used M&C's funds (i.e., M&C's bank subaccount for the Plaintiffs' project) to pay his personal expenses (e.g., personal vacation expenses, car insurance payments, taxes, retirement deposits, housekeeper payments, home mortgage payments, etc.).[16] Based on the above evidence showing that Patrick paid his personal expenses with M&C's funds and other evidence showing that he interchangeably used his own name (e.g., "Patrick McInerney, architect") on emails and other documents in conducting M&C's construction business, the court could reasonably infer that Patrick used M&C as a mere conduit for his construction business.

Further, the trial court could reasonably infer from the evidence that M&C did not maintain adequate capitalization for the nature and scope of its business and potential liabilities. In imposing alter ego liability on Patrick, the court found that there was no evidence of adequate capitalization for M&C. Although Patrick testified that he left certain funds (i.e., up to $113,000) that he had purportedly "earned" in M&C's subaccount to capitalize that account in order to pay the potential costs of Plaintiffs' project, the court could nevertheless reasonably infer that such fluctuating bank account funds did not prove that M&C had adequate capitalization for its construction business. Defendants do not cite to any M&C balance sheets or

---

[16]     Although Patrick claimed that he maintained a diary that apparently tracked M&C's funds that were used for his personal expenses, he did not present any such diary as evidence at trial to support that claim.

43

other evidence in the record showing the amounts of M&C's capitalization, if any, from 2014 through December 2017 (when the court made its alter ego finding).  The court could therefore reasonably infer that M&C had little, if any, capitalization by December 2017.[17]  Notably, as discussed in more detail below, Patrick suspended M&C's business operations and, in effect, abandoned M&C in late 2017, when he began using M&A instead of M&C for his construction business.  Even assuming that M&C had capitalization of up to $113,000 from 2014 through December 2017, the court could reasonably infer that this amount of capitalization was inadequate when considering the nature and scope of M&C's construction business, its potential liabilities, and the $2,732,627.87 amount awarded against M&C on Plaintiffs' section 7031(b) cause of action in this case.  (Cf. *Automotriz, supra*, 47 Cal.2d at p. 798 [court "could have inferred that $5,000 was an insufficient capital investment in view of the volume of business conducted" by the corporation]; *Claremont Press Pub. Co. v. Barksdale* (1960) 187 Cal.App.2d 813, 815, 817 [$500 in capitalization was irresponsible degree of undercapitalization when corporation owed $7,000 to creditor and collapsed the following year].)

The factors that the trial court could consider in making its alter ego finding included:  Patrick's ownership of all stock in M&C; his capacity as M&C's sole director, officer, and employee; his use of the same office as M&C's office; the commingling of his funds with M&C's funds (e.g., by paying his personal expenses with M&C's funds and charging M&C's expenditures

---

17    To the extent that Defendants argue that Patrick capitalized M&C by carrying commercial general liability insurance for M&C, they do not cite, and we are unaware of, any authority holding that liability insurance can constitute part of a corporation's capitalization or otherwise substitute for the lack of adequate capitalization.

on his personal credit cards); the absence of adequate capitalization of M&C; disregard of corporate formalities; and Patrick's use of M&C as a mere conduit for his construction business. (*Misik*, *supra*, 197 Cal.App.4th at p. 1073.) Based on our review of the record, there is substantial evidence to support the court's finding that the above factors showed that there was such a unity of interest and ownership between M&C and Patrick that the separate personalities of M&C and Patrick did not in reality exist. (*Sonora Diamond Corp.*, *supra*, 83 Cal.App.4th at p. 538.) There is thus substantial evidence from which the trial court could have found that the first requirement for Patrick's alter ego liability was satisfied. To the extent that Defendants cite evidence and inferences therefrom that would have supported a contrary finding by the court, they misconstrue and/or misapply the substantial evidence standard of review.

On the second requirement, we conclude that there is substantial evidence to support the trial court's finding that there would be an inequitable result if M&C's acts in this case were treated as those of the corporation alone. (*Sonora Diamond Corp.*, *supra*, 83 Cal.App.4th at p. 538.) As discussed above, under that second requirement, alter ego liability may be imposed if treating the acts as those of the corporation alone would produce an unjust or inequitable result. (*Misik*, *supra*, 197 Cal.App.4th at p. 1073.) "Application of the alter ego doctrine does not depend upon pleading or proof of fraud." (*Engineering Service Corp.*, *supra*, 153 Cal.App.2d at p. 415.) "It is enough if the recognition of the two entities as separate would result in an injustice." (*Gordon*, *supra*, 33 Cal.2d at p. 523.) The California Supreme Court has recognized that a corporation's inadequate capitalization may be sufficient to find that there would be an inequitable result if the corporate veil were not pierced and alter ego liability imposed, stating:

45

" 'If a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is *inequitable* that that shareholders should set up such a flimsy organization to escape personal liability. The attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity and will be ineffectual to exempt the shareholders from corporate debts. It is coming to be recognized as the policy of the law that shareholders should in good faith put at the risk of the business unincumbered [*sic*] capital reasonably adequate for its prospective liabilities. If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege.' " (*Automotriz*, *supra*, 47 Cal.2d at p. 797, quoting from Ballantine on Corporations (rev. ed. 1946), at pp. 302-303, italics added.)

The trial court found that there was no evidence that M&C was adequately capitalized for the nature and scope of its construction business and potential and actual liabilities, and, as discussed above, the record includes evidence showing that Patrick disregarded corporate formalities and that he used M&C, his wholly owned corporation, as a mere conduit to carry out his personal construction business. Based our review of the record, we conclude that there is substantial evidence to support the court's finding that it would be inequitable to treat M&C's acts in this case as those of M&C alone and thereby limit Plaintiffs' ability to enforce their judgment to only the amount of assets that the inoperative corporation held at the time of the judgment. There is thus substantial evidence to support the trial court's finding that the second requirement for Patrick's alter ego liability was satisfied (*Sonora Diamond Corp.*, *supra*, 83 Cal.App.4th at p. 538), and that Patrick, as the alter ego of M&C, should be held jointly liable with M&C for

46

the amount of the judgment in Plaintiffs' favor.[18] To the extent that Defendants cite evidence and inferences therefrom that would have supported a contrary finding by the court, they again misconstrue and/or misapply the substantial evidence standard of review.

Contrary to Defendants' assertion, there is nothing in the jury's special verdict that precluded the trial court from finding, in a bifurcated bench trial, that Patrick was an alter ego of M&C and imposing on him joint liability for the amount of the judgment. As the trial court noted, the jury did not find Patrick liable on Plaintiffs' causes of action for breach of contract, negligence, breach of fiduciary duty, and fraud. However, in making those findings, the jury did *not* address the question of whether Patrick should be held liable together with M&C as its alter ego. In particular, the jury was not asked to make findings on the two requirements for alter ego liability: (1) whether there was such a unity of interest and ownership between M&C and Patrick that the separate personalities of the corporation and the shareholder do not in reality exist; and (2) whether there would be an inequitable result if the acts in question were treated as those of M&C alone. (*Sonora Diamond Corp.*, *supra*, 83 Cal.App.4th at p. 538.) Further, because alter ego liability is an equitable issue, that determination must be made by the trial court and not a jury. In this case, that determination was, in fact, made by the trial court per the parties' stipulation to a bifurcated trial on that issue. (*Dow*

---

18    Because we conclude that there is substantial evidence to support the trial court's alter ego finding, we need not, and do not, address Plaintiffs' alternative argument that the trial court also properly found Patrick jointly liable with M&C under the responsible officer doctrine. (See, e.g., *People v. Roscoe* (2008) 169 Cal.App.4th 829, 832, 839 [discussing elements for imposing liability on corporate officer under responsible officer doctrine].)

*Jones Co. v. Avenel* (1984) 151 Cal.App.3d 144, 147-148; *Stark v. Coker* (1942) 20 Cal.2d 839, 846 (*Stark*); *Zoran, supra*, 185 Cal.App.4th at p. 811 [determination of alter ego liability is equitable issue within province of trial court].) Accordingly, Defendants have not carried their burden on appeal to show that the jury's special verdict precluded the trial court from finding that Patrick was an alter ego of M&C and imposing on Patrick liability for the judgment amount based thereon.

Also, contrary to Defendants' assertion, neither fraud nor bad faith is required for a finding of alter ego liability. "Application of the alter ego doctrine does not depend upon pleading or proof of fraud." (*Engineering Service Corp.*, *supra*, 153 Cal.App.2d at p. 415.) "It is enough if the recognition of the two entities as separate would result in an injustice." (*Gordon, supra*, 33 Cal.2d at p. 523.) It is correct, as Defendants note, that in 1932, the California Supreme Court stated that to impose alter ego liability, it must be shown, among other things, that "the observance of the fiction of [the] separate existence would, under the circumstances, sanction a fraud or promote injustice. Bad faith in one form or another must be shown before the court may disregard the fiction of separate corporate existence." (*Hollywood Cleaning & Pressing Co. v. Hollywood Laundry Service* (1932) 217 Cal. 124, 129 (*Hollywood*).) However, in the almost 90-year period since that case, the California Supreme Court has not repeated or reaffirmed its statement in *Hollywood* that bad faith is required for alter ego liability and has instead consistently adopted and applied the less stringent requirement of an *inequitable result*, as discussed above. (See, e.g., *Mesler v. Bragg Mgt. Co.* (1985) 39 Cal.3d 290, 300-301; *Automotriz, supra*, 47 Cal.2d at p. 796 [second requirement described as "if the acts are treated as those of the corporation alone, an inequitable result will follow"]; *Gordon*, at p. 523 ["It is not

48

necessary that the plaintiff prove actual fraud. It is enough if the recognition of the two entities as separate would result in an injustice."]; *Stark*, *supra*, 20 Cal.2d at p. 846 [same]; *Watson v. Commonwealth Ins. Co.* (1936) 8 Cal.2d 61, 68 [second requirement described as "adherence to the fiction of separate existence would, under the circumstances, promote fraud or injustice . . . . [I]t is sufficient that it appear that recognition of the acts as those of a corporation only will produce inequitable results."].) It therefore appears that just four years after *Hollywood* was decided (i.e., in 1936 in *Watson v. Commonwealth Ins. Co.*, at p. 68) the California Supreme Court abandoned any requirement of a finding of fraud or bad faith in order to impose alter ego liability and has consistently held since that time that the second requirement is satisfied when a court finds that if the acts are treated as those of the corporation alone, an inequitable result will follow. As we concluded above, there is substantial evidence to support the trial court's finding in this case that the second requirement for Patrick's alter ego liability was satisfied.[19]

---

[19] Further, if the second requirement for alter ego liability were interpreted more broadly than current case law provides so as to include consideration of the equities of section 7031(b) reimbursement liability, it is possible that the trial court could have reached a contrary finding and/or we might have concluded that this requirement was not satisfied. As Defendants suggest, there appears on its face to be an inequity in allowing Plaintiffs to retain the fruits of M&C's labor and materials (i.e., the apparently defect free La Jolla residence valued at $2.7 million) while also awarding Plaintiffs a judgment for reimbursement of all amounts they paid to M&C for construction of that residence. The result in this case is unquestionably harsh. However, given the statutory language of, and current case law pertaining to, section 7031(b) as discussed above, we are constrained from considering those underlying equities in determining whether there is substantial evidence to support the trial court's finding that the second requirement for alter ego liability is satisfied. To absolve Patrick

Further, contrary to Defendants' assertion, the trial court did not err by denying their request for a written statement of decision on its finding of alter ego liability. As Defendants concede, the trial court conducted its bifurcated trial on the alter ego issue on December 20, 2017, and in an oral ruling the court explained its reasons for finding that Patrick was liable for the judgment as M&C's alter ego. Because that trial took less than one day, Defendants were not entitled to a written statement of decision under Code of Civil Procedure section 632.[20] Contrary to Defendants' assertion, the fact that the trial court may have relied, in part, on evidence that was admitted during the jury trial on the other issues in ruling on the alter ego issue, did not convert the alter ego bifurcated trial into a three-week trial, which would have required, upon request, a written statement of decision. Defendants do not cite, nor are we aware of, any case so holding. Because Defendants have not carried their burden on appeal to affirmatively show that they were

of alter ego liability based on a perceived inequitable result would be contrary to, and in fact would negate, the remedy that the Legislature intended by enacting section 7031(b).

[20] Code of Civil Procedure section 632 provides: "In superior courts, upon the trial of a question of fact by the court, written findings of fact and conclusions of law shall not be required. The court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial. The request must be made within 10 days after the court announces a tentative decision unless the trial is concluded within one calendar day or in less than eight hours over more than one day in which event the request must be made prior to the submission of the matter for decision. . . . [¶] The statement of decision shall be in writing, unless the parties appearing at trial agree otherwise; however, *when the trial is concluded within one calendar day or in less than 8 hours over more than one day, the statement of decision may be made orally on the record in the presence of the parties.*" (Italics added.)

50

entitled to a statement of decision, we conclude that the court did not err by denying Defendants' request for a written statement of decision on its alter ego finding. In any event, Defendants have not carried their burden on appeal to affirmatively show that the court's purported error was prejudicial to them (i.e., that there was a miscarriage of justice or that they would have obtained a more favorable result if the court had issued a written statement of decision). (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1108.)

IV

*Addition of M&A as a Judgment Debtor*

Defendants contend that the trial court erred by granting Plaintiffs' request to add M&A as a judgment debtor as a successor corporation to M&C and amending the judgment accordingly.

A

After the initial judgment was entered in January 2018, Plaintiffs filed a motion to add M&A as a judgment debtor, arguing that M&A was a successor corporation to M&C. Plaintiffs argued that after the trial in this case, Patrick allowed M&C to be suspended as a California corporation, ceased conducting his construction business through M&C, and instead began using M&A to conduct his construction business. They argued that, as M&C's successor corporation, M&A should be added as a judgment debtor together with M&C and Patrick. Plaintiffs submitted evidence showing that at about the time of the January 2018 judgment, Patrick switched his business from M&C to M&A and began operating his construction business through M&A. Defendants opposed the motion, arguing that it would be inappropriate in the circumstances of this case to find that M&A was an alter

ego of M&C. However, Defendants did not dispute Plaintiffs' assertion that M&A was a successor corporation to M&C.

At the hearing on Plaintiffs' motion, citing *McClellan v. Northridge Park Townhome Owners Assn., Inc.* (2001) 89 Cal.App.4th 746 (*McClellan*), the trial court granted the motion to add M&A as a judgment debtor on the ground that M&A was a successor corporation to M&C. In its minute order, the court stated:

> "Corporations 'cannot escape liability by a mere change of name or a shift of assets when and where it is shown that the new corporation is, in reality, but a continuation of the old,' especially when the rights of creditors are involved. [Citations.] As noted, the Court previously found that M&C was [Patrick's] alter ego. M&C has not done any work since it completed its last project in 2017. [Citation.] M&C then became 'dormant' and [Patrick] began working for M&A. [Citation.] [Patrick] is the sole owner and employee of M&A. [Citation.] M&A was not doing any business as of August 2017. [Citation.] At his debtor's exam, [Patrick] said he switched companies because M&A primarily deals with design. [Citation.] However, during his deposition [Patrick] said he created M&A to service his foreign clients and M&C for local clients. [Citation.] [Patrick] also conceded that M&C also did design work. [Citation.] M&A's 2017 Statement of Information says the company is in the 'construction' business. [Citation.] [Patrick] said he receives a salary from M&A but was unable to recall how the salary is determined. [Citation.] In 2018, M&A paid for some of the McInerney family's personal expenses such as a personal trainer and housekeeper. [Citation.] [Patrick] similarly used M&C to pay personal expenses. Based on the foregoing, [P]laintiffs have proven that M&A is merely a continuation of M&C. It appears that [Patrick] has sought to frustrate [P]laintiffs' ability to collect on the judgment by essentially changing the name of his business while carrying on the same business as before. Under these circumstances, it is

> appropriate to hold M&A liable as a judgment debtor.
> Accordingly, the motion to add M&A as a judgment debtor
> is granted."

On January 25, 2019, the trial court entered a second amended judgment adding M&A as a judgment debtor together with M&C and Patrick for a total judgment amount of $2,940,325.50, which included an award of Plaintiffs' attorney fees and costs.

B

Under Code of Civil Procedure section 187, the "trial court has jurisdiction to modify a judgment to add additional judgment debtors." (*McClellan*, *supra*, 89 Cal.App.4th at p. 752.) As an alternative to alter ego liability, modification of a judgment to add a judgment debtor may also be proper under the successor corporation theory. (*Wolf Metals Inc.*, *supra*, 4 Cal.App.5th at p. 704.) "According to that theory, when a corporation sells or transfers all of its assets to another corporation constituting its ' "mere continuation," ' the latter is also liable for the former's debts and liabilities. [Citations.]" (*Id.* at pp. 704-705.) " 'California decisions holding that a corporation acquiring the assets of another corporation is the latter's mere continuation and therefore liable for its debts have imposed such liability only upon a showing of one or both of the following factual elements: (1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; (2) one or more persons were officers, directors, or stockholders of both corporations. [Citations.]' " (*McClellan*, at p. 754, fn. 4, quoting *Ray v. Alad Corp.* (1977) 19 Cal.3d 22, 29.) Alternatively stated, " 'corporations cannot escape liability by a mere change of name or a shift of assets when and where it is shown that the new corporation is, in reality, but a continuation of the old. Especially is

53

this well settled when actual fraud or the rights of creditors are involved, under which circumstances the courts uniformly hold the new corporation liable for the debts of the former corporation.' " (*Cleveland v. Johnson* (2012) 209 Cal.App.4th 1315, 1327 (*Cleveland*), quoting *Blank v. Olcovich Shoe Corp.* (1937) 20 Cal.App.2d 456, 461 (*Blank*).)

The application of the successor corporation theory is an equitable issue to be decided based on the unique facts of a case. (*Cleveland, supra*, 209 Cal.App.4th at p. 1330.) Accordingly, on appeal, we apply the substantial evidence standard in reviewing a trial court's determination to apply the successor corporation theory to add a successor corporation as a judgment debtor. (*Wolf Metals Inc., supra*, 4 Cal.App.5th at p. 703; *McClellan, supra*, 89 Cal.App.4th at pp. 751-752.)

C

Based on our review of the record, we conclude that there is substantial evidence to support the trial court's finding that M&A is a successor corporation to M&C and therefore, should be added as a judgment debtor. The evidence showed that Patrick was the sole shareholder, sole director, sole officer, and sole employee of both M&C and M&A. Patrick incorporated M&C in 2011 and M&A in July 2014. M&C's statement of information for 2016 stated that it was in the business of construction, while its statement of information for 2017 stated that it was in the business of architecture. M&A's statements of information for 2016 and 2017 stated that it was in the business of construction. Patrick testified that he did not know why he had two corporations that engaged in construction in California. Patrick testified that M&C and M&A share the same office, the same computers, and the same accountant. He testified that he maintained a diary in which he

recorded his time worked for each of M&C and M&A, but was unable to find that diary.

At his judgment debtor's examination in July 2018, Patrick testified that he did not recall receiving any compensation from M&A prior to January 2, 2018. After Patrick ceased working for M&C in late 2017, M&C became dormant. He could not recall working on any projects for M&A prior to 2018. Patrick testified that M&C was initially a design company and became a design and construction company because of Plaintiffs' project, while M&A focused only on design. He testified that he received a salary from M&A, but could not recall how that salary was determined. Patrick's attorney instructed him not to answer questions regarding M&A, such as balances in its bank accounts, its gross revenues, and the projects it worked on.

The above evidence supports findings by the trial court that one person (i.e., Patrick) was the shareholder, director, and officer of both M&C and M&A, thereby satisfying one of the two factors, and thus the minimum required, for application of the successor corporation doctrine to add M&A as a judgment debtor. (*McClellan*, *supra*, 89 Cal.App.4th at p. 754, fn. 4; *Ray v. Alad Corp.*, *supra*, 19 Cal.3d at p. 29.) In addition, based on the evidence showing that Patrick ceased working for and, in effect, abandoned M&C and then immediately began to conduct his business through M&A, the court could reasonably infer that Patrick transferred his construction and design business from M&C to M&A in late 2017 or early 2018 and that there was no evidence showing that M&A paid M&C any consideration for the transfer of M&C's business and other assets (e.g., business goodwill). Based on this evidence, the court could reasonably infer that no adequate consideration was given by M&A for M&C's assets, which could have been made available for meeting the claims of unsecured creditors (e.g., Plaintiffs), thereby satisfying

55

the other (and non-essential) factor for application of the successor corporation doctrine. (*McClellan*, at p. 754, fn. 4; *Ray v. Alad Corp.*, at p. 29.) Even in the absence of an actual transfer of assets from M&C to M&A, the court could reasonably infer that Patrick switched his design and construction business from M&C to M&A to hinder Plaintiffs' recovery of the judgment against M&C (cf. *McClellan*, at pp. 750, 755-756), and thus, that "in reality" M&A was a mere continuation of the business of M&C. (*Cleveland*, *supra*, 209 Cal.App.4th at p. 1327; *Blank*, *supra*, 20 Cal.App.2d at p. 461.) We therefore conclude that there is substantial evidence to support the court's finding that the successor corporation doctrine applied and that M&A should be added as a judgment debtor. (*Wolf Metals Inc.*, *supra*, 4 Cal.App.5th at p. 703; *McClellan*, at pp. 751-752.) To the extent that Defendants cite evidence or inferences therefrom that would have supported a contrary finding by the trial court, they again misconstrue and/or misapply the substantial evidence standard of review. (*Wolf Metals Inc.*, at p. 703; *McClellan*, at pp. 751-752.) Accordingly, Defendants have not carried their burden on appeal to affirmatively show that the trial court erred by granting Plaintiffs' motion to add M&A as a judgment debtor and entering the second amended judgment adding M&A as a judgment debtor.[21]

---

[21] In particular, we are not persuaded by Defendants' conclusory assertion that application of the successor corporation doctrine in this case would violate the constitutional prohibition against involuntary servitude. (U.S. Const., 13th Amend., § 1 ["Neither slavery nor involuntary servitude . . . shall exist within the United States . . . ."].) Defendants do not cite, and we are not aware of, any case holding that the 13th Amendment applies to preclude the application of the successor corporation doctrine to cases involving two corporations with the same sole shareholder and sole employee.

V

*Award of Attorney Fees under Section 1029.8*

Defendants contend that the trial court erred by awarding Plaintiffs attorney fees under section 1029.8 in the amount of $155,008.50 for prevailing on Plaintiffs' section 7031(b) cause of action.

A

Originally enacted in 1985, section 1029.8 currently provides:

> "(a) Any unlicensed person who causes injury or damage to another person as a result of providing goods or performing services for which a license is required under . . . Division 3 (commencing with Section 5000) . . . of the Business and Professions Code . . . shall be liable to the injured person for treble the amount of damages assessed in a civil action in any court having proper jurisdiction. The court may, in its discretion, award all costs and attorney's fees to the injured person if that person prevails in the action. [¶] . . . [¶]
>
> "(d) For the purposes of this section, the term 'unlicensed person' shall not apply to any of the following: [¶] (1) Any person, partnership, corporation, or other entity providing goods or services under the good faith belief that they are properly licensed and acting within the proper scope of that licensure. . . ." (Stats. 1985, ch. 895, § 1; amended by Stats. 2004, ch. 575, § 1.)

As discussed above, in interpreting a statute, "our fundamental objective is to ascertain the legislative intent." (*Alatriste, supra,* 183 Cal.App.4th at p. 663.) We initially focus on the words of the statute because statutory language is generally the most reliable indicator of legislative intent. (*Ibid.*) The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context. (*Ibid.*;

57

*MW Erectors*, *supra*, 36 Cal.4th at p. 426.)  If the statutory language is unambiguous, we presume the Legislature intended what it stated and the plain meaning of the statute governs.  (*MW Erectors*, at p. 426.)  On appeal, we independently review the legal question of the proper interpretation of a statute.  (*Alatriste*, at p. 664; *Kirby v. Immoos Fire Protection, Inc.* (2012) 53 Cal.4th 1244, 1250 [independent, or de novo, review of questions of statutory construction].)  Accordingly, we review, de novo, the trial court's interpretation of section 1029.8 in this case.  (*Rony v. Costa* (2012) 210 Cal.App.4th 746, 756 [de novo review of interpretation of § 1029.8].)

B

As noted above, Plaintiffs elected the remedy of reimbursement under their section 7031(b) cause of action in lieu of the damages awarded by the jury for their cause of action for breach of the construction contract.  After the trial court entered its initial judgment in favor of Plaintiffs, Plaintiffs filed a motion for an award of attorney fees requesting that the court award fees pursuant to section 1029.8.  Defendants opposed the motion, arguing that section 1029.8 was inapplicable to Plaintiffs' award of reimbursement pursuant to section 7031(b) because Plaintiffs were not an "injured" party under that statute.  In reply, Plaintiffs argued that section 1029.8 could apply to their section 7031(b) reimbursement award because they were "injured" by M&C's actions.

On August 3, 2018, the trial court issued an order granting Plaintiffs' motion for attorney fees under section 1029.8, stating:

> "Defendants argue that [P]laintiffs do not qualify as an
> 'injured party' because [P]laintiffs elected the remedy of
> disgorgement under . . . section 7031 which does not
> require a showing of injury or damage.  Defendants'

58

argument fails to acknowledge that section 1029.8 specifically incorporates Division 3 of the Business and Professions Code, which includes . . . section 7031. Thus, section 1029.8 contemplates that fees may be awarded in cases where an unlicensed contractor is required to forfeit their compensation. Moreover, section 1029.8 does not 'affect or limit any other remedy, including, but not limited to, a claim for exemplary damages.' [Citation.] Thus, the fact that [P]laintiffs elected a statutory remedy does not preclude them from seeking fees."

Accordingly, the court awarded Plaintiffs attorney fees in the amount of $155,008.50 that they incurred in prevailing on their motion for summary adjudication of their section 7031(b) cause of action.

## C

In challenging the attorney fee award, Defendants assert that the trial court erred in interpreting section 1029.8 in a manner that would allow an award of attorney fees to a party that prevails on a cause of action for section 7031(b) reimbursement. Defendants argue that the plain language of section 1029.8 requires that an unlicensed person "cause[] injury or damage" to another person (i.e., the "injured person") as a result of providing goods or performing services for which a license is required and provides that the court may award attorney fees "to the injured person". (§ 1029.8.) Because Plaintiffs elected the section 7031(b) remedy of reimbursement, which is not based on injury or damage, Defendants argue that Plaintiffs are not injured persons within the meaning of section 1029.8 and the court therefore erred by awarding Plaintiffs attorney fees.

As Defendants note, a section 7031(b) reimbursement award is, in effect, a statutory penalty imposed on an unlicensed contractor based on public policy and not on the equities of a particular case or any injury

59

suffered by a customer of an unlicensed contractor. (*MW Erectors, supra*, 36 Cal.4th at pp. 418, 423, 425; *Hydrotech Systems, Ltd. v. Oasis Waterpark* (1991) 52 Cal.3d 988, 995, 997 (*Hydrotech*).) The California Supreme Court stated that the CSLL "imposes strict and harsh *penalties* for a contractor's failure to maintain proper licensure." (*MW Erectors,* at p. 418, italics added.) Those penalties apply "regardless of the merits of" an action. (*Ibid*.) In enacting section 7031(a), the Legislature intended "to impose a stiff all-or-nothing penalty for unlicensed work." (*Id*. at p. 426.) We infer that the Legislature had the same intent in enacting section 7031(b) in 2001. "By adding this [section 7031(b)] remedy, the Legislature sought to further section 7031(a)'s policy of deterring violations of licensing requirements by 'allow[ing] persons who utilize unlicensed contractors to recover compensation paid to the contractor for performing unlicensed work. [Citation.]' [Citation.]" (*Alatriste, supra*, 183 Cal.App.4th at p. 666.) "[T]he Legislature intended that courts interpret section[s] 7031(a) and [7031](b) in a consistent manner, resulting in the same remedy regardless of whether the unlicensed contractor is the plaintiff or defendant." (*Ibid*.) Alternatively stated, "the Legislature enacted section 7031(b) to ensure the same *penalties* apply for an unlicensed contractor regardless whether the contractor was the plaintiff or the defendant." (*Id*. at p. 667, italics added.) Accordingly, to establish a section 7031(b) reimbursement cause of action, a plaintiff need not prove that the unlicensed contractor/defendant caused the plaintiff an injury by reason of negligent or deficient services, defective materials, or other injurious acts, but need simply show that the unlicensed contractor/defendant was paid for services or materials for which a contractor's license was required. (*Miller v. Municipal Court of Los Angeles* (1943) 22 Cal.2d 818, 837 ["The test generally underlying most of the cases

60

. . . is that a 'penalty' includes any law compelling a defendant to pay a plaintiff other than what is necessary to compensate him for a legal damage done him by the former."].) Therefore, a section 7031(b) reimbursement cause of action can be successful even where, as in this case, the unlicensed contractor's services and materials met prevailing construction standards and, as a result, the plaintiff did not suffer any actual injury or damage from those services and materials. (Cf. *Siry Investment, L.P. v. Farkhondehpour* (2020) 45 Cal.App.5th 1098, 1141 [no attorney fee award allowed under § 1029.8 because plaintiff did not allege contractor's unlicensed status caused its injury].)

Independently construing the language of section 1029.8, we conclude that its plain language allows an award of attorney fees *only* when an unlicensed person "causes injury or damage" to another person (i.e., the "injured person") as a result of providing goods or performing services for which a license is required. (§ 1029.8.) Next, independently construing the language of section 7031(b), we conclude that its plain language requires, as a statutory penalty, reimbursement of all compensation paid to an unlicensed contractor for all services performed and all materials provided for which a contractor's license is required. (§ 7031(b); see also *MW Erectors, supra*, 36 Cal.4th at pp. 418, 423, 425; *Hydrotech, supra*, 52 Cal.3d at pp. 995, 997; *Alatriste, supra*, 183 Cal.App.4th at p. 667.) A section 7031(b) reimbursement award is a statutory penalty that applies regardless of whether the plaintiff has suffered any legal injury or damage as a result of services or goods provided by an unlicensed contractor within the meaning of section 1029.8.

The trial court's order granting Plaintiffs' motion for summary adjudication on their second cause of action under section 7031(b) made no

finding regarding any legal injury or damage suffered by Plaintiffs caused by M&C's unlicensed status. Rather, the amount of the section 7031(b) reimbursement award was based solely on the total amount of compensation paid by Plaintiffs to M&C. The judgment awarding Plaintiffs reimbursement for the amounts paid to M&C was therefore a *statutory penalty* under section 7031(b) that was imposed without any nexus or connection to any legal injury or damage suffered by Plaintiffs. (*MW Erectors, supra*, 36 Cal.4th at pp. 418, 423, 425; *Hydrotech*, *supra*, 52 Cal.3d at pp. 995, 997; *Alatriste*, *supra*, 183 Cal.App.4th at p. 667.) Because the jury did not find that Plaintiffs suffered any legal injury or damage caused by M&C's unlicensed status, section 1029.8's plain language does not apply to allow an award of attorney fees. Accordingly, we conclude that the trial court erred by awarding Plaintiffs attorney fees of $155,008.50 pursuant to section 1029.8.[22]

Plaintiffs assert, and the trial court found, that section 1029.8 applied to a section 7031(b) reimbursement award because section 1029.8, subdivision (a) lists Division 3 of the Business and Professions Code, which includes section 7031(b) and other contractor licensing provisions (i.e., § 7000 et seq.), within the types of licenses covered by section 1029.8. Initially, we agree that it is a *prerequisite* to a section 1029.8 attorney fee award that the defendant be an unlicensed contractor. Specifically, section 1029.8(a) lists those types of licenses for which an attorney fee award *may* be imposed against an unlicensed person for provision of services that require a license.

_____

[22] Because we dispose of this issue based on section 1029.8's plain language, we need not, and do not, address Defendants' alternative assertion that no section 1029.8 attorney fee award was appropriate because M&C acted "under a good faith belief" that it was properly licensed within the meaning of section 1029.8, subdivision (d).

62

However, contrary to Plaintiffs' and the trial court's apparent understanding, that unlicensed status is insufficient, by itself, to support an attorney fee award under section 1029.8; there must also be a finding that the unlicensed person caused a legal injury or damage to the plaintiff as a result of providing goods or performing services for which a license is required. (§ 1029.8, subd. (a).) Because, as discussed above, Plaintiffs' section 7031(b) reimbursement award was not based on any legal injury or damage that they suffered, Plaintiffs are not entitled to an award of their attorney fees under section 1029.8.

*PLAINTIFFS' CROSS-APPEAL*

VI

*Section 3287(a) Prejudgment Interest*

In their cross-appeal, Plaintiffs contend that the trial court erred by denying their request for prejudgment interest under section 3287(a). Plaintiffs assert that because they timely and sufficiently requested an award of prejudgment interest under section 3287(a), they are entitled to an award of prejudgment interest under that statute as a matter of law.

A

Section 3287(a) provides:

> "A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day . . . ."

One purpose of section 3287(a) prejudgment interest is to provide compensation to the plaintiff for the loss of use of the award during the

63

prejudgment period. (*Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 663.) Under section 3287(a), "the court has no discretion, but must award prejudgment interest upon request . . . ." (*North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 828 (*North Oakland*).)

"[T]here is no authority mandating any particular procedure for securing an award of prejudgment interest." (*North Oakland, supra*, 65 Cal.App.4th at p. 829.) "[N]o statute or rule of court establishes a procedure for requesting an award of prejudgment interest, or a time limit therefor, in the superior court." (*Id.* at pp. 829-830.) Nevertheless, a party must make a reasonably timely request for prejudgment interest. "[P]rejudgment interest is not a cost, but an element of damages," and therefore "prejudgment interest should be awarded in the judgment on the basis of a specific request therefor made *before* entry of judgment." (*Id.* at p. 830.) "A general prayer in the complaint is adequate to support an award of prejudgment interest." (*Id.* at p. 829.) Regarding the timeliness of a request, "at the latest, a request for prejudgment interest under section 3287 may be sought as part of a motion for new trial pursuant to Code of Civil Procedure section 657 . . . ." (*North Oakland,* at p. 830.) In the absence of a statute or a rule of court setting forth procedural requirements for a request for prejudgment interest, the court in *North Oakland* concluded that "requests for prejudgment interest under section 3287 by a successful plaintiff must be made by way of motion prior to entry of judgment, or the request must be made in the form of a motion for new trial no later than the time allowed for filing such a motion. (Code Civ. Proc., § 659.)" (*North Oakland*, at p. 831.)

However, at least one other court has held, instead, that a formal motion is *not* a prerequisite for an award of section 3287 prejudgment interest. In *Watson Bowman Acme Corp. v. RGW Construction, Inc.* (2016) 2

64

Cal.App.5th 279 (*Watson*), the court stated: "[T]he fact that Watson's request [for prejudgment interest] was not labeled as [a] motion for new trial or as a motion for modification under Code of Civil Procedure section 657 does not render its format defective. [Citations.]"[23] (*Watson*, at p. 299.) Rather, a request for prejudgment interest is sufficient if it "provides the relevant information to the opposing party and the court and gives the adverse party a reasonable opportunity to oppose the request on its merits. [Citations.]" (*Ibid.*) In the circumstances of *Watson*, the court concluded that "Watson's request clearly identified (1) the relief requested (i.e., the addition of prejudgment interest to the amount of the judgment) and (2) the grounds upon which the request was based--specifically, [section 3287(a)] and its contention that the damages were a liquidated sum. Furthermore, Watson provided RGW a sufficient opportunity to oppose the request, as is evident from the written opposition filed by RGW with the court. Consequently, we conclude Watson's request provided RGW with the [*sic*] *sufficient notice* and a *reasonable opportunity for opposition*, thus satisfying the purpose and requirements of Code of Civil Procedure section 659, subdivision (a)." (*Watson*, at p. 299, italics added.) Accordingly, the court concluded that "the format of Watson's request for prejudgment interest was not defective." (*Id.* at p. 300.)

---

[23]  *Watson* further clarified that "[a] request for prejudgment interest is not a request for a new trial . . . , but a request to modify the decision to include an award of prejudgment interest." (*Watson*, *supra*, 2 Cal.App.5th at p. 298, fn. 14.)

B

In their complaint, Plaintiffs alleged that they had made 10 payments to Defendants, which totaled $2,732,627.87, and they specified the amounts of each of those 10 payments. In their second cause of action for section 7031(b) reimbursement (or disgorgement), Plaintiffs sought reimbursement of all amounts paid to Defendants, "which amount is at least $2,732,627.87, *plus interest.*" (Italics added.) In their prayer for relief, Plaintiffs included the following request: "7. For *prejudgment interest according to law.*" (Italics added.)

On January 22, 2018 (after the jury had returned its special verdict), Plaintiffs served Defendants with their proposed judgment, which included a provision stating: "On the Second Cause of Action for Disgorgement of Contractor's Fees, the sum of $2,732,627.87, plus prejudgment interest at the rate of 10% per annum to the date hereof in the amount of $_____." In submitting that proposed judgment, Christopher Elliott, Plaintiffs' counsel, stated in an accompanying letter:

> "For the Court's ease in calculating prejudgment interest, prejudgment interest from the dates of the payments to be disgorged to the date of this filing [i.e., January 22, 2018] totals $795,297.20 at 10% per annum, and increases by $748.66 per day thereafter until entry of judgment ($2,732,627.87 times 10% divided by 365). A chart summarizing the accumulated interest through the date of this filing is attached (hereto as Exhibit B)."

Exhibit B, as referenced above and attached to Plaintiffs' submission of their proposed judgment, set forth a table or chart that listed the date and amount of each of the 10 payments made by Plaintiffs to M&C, as follows:

66

| "Check Date | | Amount |
|---|---|---|
| "05/08/14 | $ | 50,000.00 |
| "08/25/14 | | 346,901.62 |
| "11/25/14 | | 633,127.47 |
| "02/26/15 | | 430,000.00 |
| "02/26/15 | | 250,000.00 |
| "03/12/15 | | 180,000.00 |
| "07/25/15 | | 741,418.00 |
| "10/21/15 | | 2,799.19 |
| "10/21/15 | | 19,627.29 |
| "10/21/15 | | 78,754.30 |
| | $ | 2,732,627.87"[24] |

On February 1, 2018, Defendants filed their objection to Plaintiffs' proposed judgment, arguing that "the judgment should not provide for any award of prejudgment interest to Plaintiffs."

On February 8, 2018, Plaintiffs filed their response to Defendants' objections to their proposed judgment, arguing: "Plaintiffs are *entitled to an award of interest pursuant to . . . section 3287*." (Italics added.) Plaintiffs quoted section 3287(a) and argued: "That test is obviously met here. Here, prejudgment interest on Plaintiffs' section 7031 claim is required because the amounts ordered disgorged were 'certain, or capable of being made certain by calculation.' They are simply the amounts paid for construction by Plaintiffs to [M&C]. Those amounts are certain. . . . The amount of prejudgment interest to be awarded is easily calculated. . . . Defendants have not challenged [Plaintiffs' calculation attached to their proposed judgment]."

---

[24] Exhibit B also listed the check number and invoice number for each of those 10 payments.

Plaintiffs further argued that the court, and not the jury, must determine their entitlement to prejudgment interest under section 3287.

On February 28, 2018, the trial court entered a judgment for Plaintiffs, which included the above provision in their proposed judgment stating: "On the Second Cause of Action for Disgorgement of Contractor's Fees, the sum of $2,732,627.87, plus prejudgment interest at the rate of 10% per annum to the date hereof in the amount of $_____." The judgment did not set forth the amount of prejudgment interest in the blank provided, nor did it expressly provide that an award of prejudgment interest, or the amount thereof, was yet to be determined.[25]

On March 16, 2018, Plaintiffs filed a document titled: "PLAINTIFFS' REQUEST TO ADD AMOUNT OF PREJUDGMENT INTEREST TO JUDGMENT." Plaintiffs' request for prejudgment interest asked the trial court to add to its February 28, 2018 judgment prejudgment interest in the amount of $822,998.51 through the date of that judgment. Noting that the amount of prejudgment interest had been left blank in the February 28, 2018 judgment, Plaintiffs calculated the correct amount of total prejudgment interest (i.e., $822,998.51) and attached an exhibit setting forth the dates and amounts of the 10 payments made by Plaintiffs to M&C and the amount of prejudgment interest that should be awarded with respect to each such payment.

---

[25] In contrast, the judgment entered on February 28, 2018, included the handwritten acronym "TBD" in three subsequent blanks relating to Plaintiffs' recovery of costs, their recovery of attorney fees, and the total amount of the judgment award. We presume that "TBD" is an acronym used by the court to indicate that those three other issues remained "to be determined."

68

On April 23, 2018, Defendants filed their objection to Plaintiffs' request for prejudgment interest and proposed nunc pro tunc amended judgment that would set forth the amount of prejudgment interest awarded (i.e., $822,998.87).[26] Citing *North Oakland*, Defendants argued that the time for Plaintiffs to file a motion for an award of prejudgment interest had expired. They argued that in requesting an award of prejudgment interest, Plaintiffs did not request a hearing date or briefing schedule and therefore, Defendants "have never received due process" as required by *North Oakland*. Defendants also argued that section 3287(a) prejudgment interest cannot be awarded on a section 7031(b) disgorgement judgment because Plaintiffs did not suffer any actual monetary loss.

On April 25, 2018, Plaintiffs filed their response to Defendants' objection to their request for prejudgment interest. Plaintiffs argued that their request was timely and that it satisfied the requirements set forth in *North Oakland* and *Watson*. Specifically, Plaintiffs argued that they had timely requested an award of section 3287(a) prejudgment interest both before the judgment was entered and soon thereafter, and that Defendants had an opportunity to respond to Plaintiffs' requests for prejudgment interest and had, in fact, filed their written opposition to those requests. Plaintiffs also argued that an award of section 3287(a) prejudgment interest is appropriate on the amount of a section 3071(b) judgment because the amounts of the payments to be reimbursed pursuant to that judgment were certain or capable of being made certain by calculation within the meaning of section 3287(a).

---

[26] Defendants represented that on April 13, 2018, they had been served with Plaintiffs' proposed nunc pro tunc amended judgment.

69

The record on appeal does not contain any order by the trial court either expressly approving or denying Plaintiffs' request to add prejudgment interest to its judgment, until the court's November 9, 2018 order discussed below. At a March 2, 2018 hearing on Defendants' motion for reconsideration of the court's denial of their request for a statement of decision, Plaintiffs' counsel inquired why the court had not included the amount of prejudgment interest in its February 28, 2018 judgment. The court stated that its judgment included several blanks that would have to be determined at a later date. At the initial June 8, 2018 hearing on Defendants' motion to tax costs, in addressing a Code of Civil Procedure section 998 issue, the court stated that it would not sign Plaintiffs' proposed nunc pro tunc amended judgment that sought prejudgment interest, based on its apparent belief that it had already ruled on that issue. At the continued August 3, 2018 hearing on Defendants' motion to tax costs, the court maintained that it had already ruled on Plaintiffs' request for prejudgment interest and had not awarded them prejudgment interest. Plaintiffs argued that the court had yet to rule on their request for prejudgment interest. The court disagreed and stated that to the extent Plaintiffs were asking the court to reconsider the prejudgment interest issue, it denied that renewed request as having been made without proper notice thereof.

On September 27, 2018, Plaintiffs filed a notice of motion and motion for an order granting their request for an award of prejudgment interest. On October 29, Defendants filed their opposition to Plaintiffs' motion. On November 2, Plaintiffs filed their reply to Defendants' opposition. At a hearing on November 9, the trial court denied Plaintiffs' motion to add prejudgment interest. The court stated in part:

70

"Judgment was entered on February 28, 2018. [Citation.] Although the judgment included a blank line where an award of prejudgment interest could have been inserted, no amount was entered because prejudgment interest had not been requested by motion.

"Plaintiffs' motion for prejudgment interest was filed September 27, 2018. [Citation.] The motion was filed beyond the time to bring a motion for new trial. . . . [¶] [P]laintiffs never before filed a motion under section 3287. The submission of a proposed judgment is not sufficient. Indeed, the first indication that [P]laintiffs were seeking interest under section 3287 was in response to [D]efendants' objection to the proposed judgment. [Citations.]

" . . . In contrast to *Watson*, the motion now before the Court was not made within the time for a new trial motion. Thus, it does not substantially comply with the statute governing new trial motions."

Accordingly, the court denied Plaintiffs' motion.

On January 25, 2019, the court entered a second amended judgment against M&C, Patrick, and M&A for a total amount of $2,940,325.50, which included the attorney fee award and costs and did not include an award of prejudgment interest.

C

At the outset, we address Plaintiffs' assertion that their cross-appeal of the November 9, 2018 order is timely. Defendants argue that because Plaintiffs' notice of cross-appeal was not timely filed, this court lacks jurisdiction to consider Plaintiffs' challenge to the November 9, 2018 order. As we explain below, we agree with Plaintiffs that their cross-appeal of the November 9, 2018 order is timely.

71

On November 9, 2018, the trial court issued its order denying Plaintiffs' motion to add prejudgment interest to the judgment. On December 30, 2018, Plaintiffs filed a notice of cross-appeal challenging the court's November 9, 2018 order, but the notice misidentified the case number and apparently was electronically filed in the San Diego County Superior Court's register of actions under a different case. Responding to this court's letter of inquiry, Plaintiffs submitted a letter on January 28, 2019, informing us that on December 30, 2018, they had filed a notice of cross-appeal challenging the November 9, 2018 order in the instant case, but that their notice of cross-appeal had been mistakenly filed in a different case (i.e., Case No. 37-2018-00049647-CU-MC-CTL). On January 25, 2019, the court entered its second amended judgment, which crossed-out language included in the February 28, 2018 judgment relating to its award on the second cause of action that read: "plus prejudgment interest at the rate of 10% per annum to the date hereof in the amount of $_____." On February 5, 2019, Plaintiffs served on all parties a notice of entry of the January 25, 2019 second amended judgment. On February 13, 2019, Defendants filed their notice of appeal challenging the January 25, 2019 second amended judgment. On March 6, 2019, Plaintiffs filed a second notice of cross-appeal, again challenging the November 9, 2018 order. This notice of cross-appeal correctly identified the instant case number.

Code of Civil Procedure section 904.1, subdivision (a)(2) provides that a party may appeal "an order made after a judgment made appealable by paragraph (1)." Because the February 28, 2018 judgment was appealable pursuant to Code of Civil Procedure section 904.1, subdivision (a)(1), the November 9, 2018 order, which was issued after that judgment, is appealable pursuant to Code of Civil Procedure section 904.1, subdivision (a)(2).

72

The timeliness of an appeal is generally determined by California Rules of Court, rule 8.104(a).[27] That rule provides:

> "(1) Unless a statute or rules 8.108, 8.702, or 8.712 provide otherwise, a notice of appeal must be filed on or before the earliest of:
>
> "(A) 60 days after the superior court clerk serves on the party filing the notice of appeal a document entitled 'Notice of Entry' of judgment or a filed-endorsed copy of the judgment, showing the date either was served;
>
> "(B) 60 days after the party filing the notice of appeal serves or is served by a party with a document entitled 'Notice of Entry' of judgment or a filed-endorsed copy of the judgment, accompanied by proof of service; or
>
> "(C) 180 days after entry of judgment."[28] (Cal. Rules of Court, rule 8.104(a).)

Rule 8.104(b) provides: "Except as provided in rule 8.66, no court may extend the time to file a notice of appeal. If a notice of appeal is filed late, the reviewing court must dismiss the appeal."

Defendants argue, in a conclusory manner, that Plaintiffs' notice of cross-appeal was untimely because it was not filed within 60 days of the November 9, 2018 order. However, in so arguing, Defendants do not cite to any document in our records or the record on appeal (or, for that matter, in the register of actions maintained by the San Diego County Superior Court) showing that a notice of entry of that order, or a filed-endorsed copy of that

---

[27] All references to rules are to the California Rules of Court.

[28] Rule 8.108(g) provides for 20-day extensions for the time to file a cross-appeal in certain circumstances, which we need not address in this case.

order, was served by either the San Diego County Superior Court clerk or a party. Such service would have triggered a shortened 60-day appeal period pursuant to rule 8.104(a)(1)(A) or (B) in lieu of the default 180-day appeal period pursuant to rule 8.104(a)(1)(C). Although the November 9, 2018 order expressly directed Plaintiffs "to serve notice on all parties within 2 court days of this ruling," there is nothing in our records or the record on appeal (nor apparently in the San Diego County Superior Court's register of actions) showing that Plaintiffs served notice of the order on all parties.[29] Because Defendants do not cite to, and we are not aware of, any document showing that either the superior court clerk or a party served a notice of entry, or a filed-endorsed copy, of the November 9, 2018 order, the default 180-day appeal period pursuant to rule 8.104(a)(1)(C) applies to Plaintiffs' cross-appeal of that order. Therefore, regardless of whether Plaintiffs' notice of cross-appeal filed on December 30, 2018 or their second notice of cross-appeal filed on March 6, 2019 is the operative notice of appeal, Plaintiffs timely filed a notice of cross-appeal within the 180-day appeal period that began to run on November 9, 2018. Defendants do not cite to any document or authority persuading us to reach a contrary conclusion.

Even assuming that a 60-day appeal period applied pursuant to rule 8.104(a)(1)(A) or (B), we would nevertheless conclude that Plaintiffs timely

---

[29] The November 9, 2018 order addressed both Plaintiffs' request for prejudgment interest and their motion to add M&A as a judgment debtor. We presume that the trial court's direction to Plaintiffs to serve all parties "of this ruling" was not limited to just its ruling on Plaintiffs' motion to add M&A as a judgment debtor.

filed a notice of cross-appeal within that period.[30]  The notice of cross-appeal filed by Plaintiffs on December 30, 2018 expressly appealed from orders "entered on 11/09/2018 and 11/30/2018."  The only order filed by the court on November 9, 2018 that was adverse to Plaintiffs was its order denying their request for prejudgment interest.  Rule 8.100(a)(2) provides:  "The notice of appeal must be liberally construed.  The notice is sufficient if it identifies the particular judgment or order being appealed."  When it is reasonably clear what an appellant is trying to appeal from and the respondent would suffer no prejudice, an appellate court should treat a notice of appeal as being from that underlying judgment or order.  (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 18; see also *Luz v. Lopes* (1960) 55 Cal.2d 54, 59-60.)  Even though Plaintiffs' December 30, 2018 notice of cross-appeal misidentified the superior court case number for this case, it clearly identified the order being appealed (i.e., November 9, 2018 order) and thereby gave Defendants notice of what order they were appealing.  Accordingly, when Defendants were served with a notice of that cross-appeal, they were not prejudiced by the (presumably clerical) error in identifying the case number for Plaintiffs' cross-appeal of the November 9, 2018 order.  (Cf. *D'Avola v. Anderson* (1996) 47 Cal.App.4th 358, 362 ["The

_____

[30]  On August 5, 2019, Plaintiffs filed the civil case information statement for their second notice of cross-appeal challenging the November 9, 2018 order.  Plaintiffs state therein that a notice of entry of that order was served on February 5, 2019, by either the superior court clerk or a party.  However, our review of the San Diego County Superior Court's register of actions shows that the notice of entry served by Plaintiffs on February 5, 2019, was a copy of the January 25, 2019 second amended judgment and not the November 9, 2018 order.  We therefore remain unpersuaded that a notice of entry of the November 9, 2018 order was served, which service would have triggered a shortened 60-day appeal period pursuant to rule 8.104(a)(1)(A) or (B).

75

fact that the wrong superior court case number was affixed to the notice of appeal does not change the result" because the California Rules of Court do not require any case number to be affixed to a notice of appeal to be effective]; *Aguilar v. Gostischef* (2013) 220 Cal.App.4th 475, 479 [applying *D'Avola*'s reasoning to allow appeal where notice of appeal was filed in a different case].) Accordingly, construing Plaintiffs' December 30, 2018 notice of cross-appeal liberally, we conclude that Plaintiffs timely cross-appealed the November 9, 2018 order. (Rule 8.100(a)(2); *D'Avola*, at p. 362; *Aguilar v. Gostischef*, at p. 479.)

D

Addressing the merits of Plaintiffs' contention, we agree with Plaintiffs that the trial court erred by denying their request for an award of section 3287(a) prejudgment interest on the ground that their request was not timely. As discussed above, while the trial court based its ruling at least in part on the fact that Plaintiffs had not filed a timely noticed motion for prejudgment interest, there is no statute or rule of court that establishes a procedure, or time limit, for requesting an award of section 3287(a) prejudgment interest. (*Watson*, *supra*, 2 Cal.App.5th at p. 297; *Steiny & Co., Inc. v. California Electric Supply Co.* (2000) 79 Cal.App.4th 285, 294; *North Oakland*, *supra*, 65 Cal.App.4th at pp. 829-830.) Rather, a request for section 3287(a) prejudgment interest requires only that the party opposing the request be provided sufficient *notice* of the request and a reasonable *opportunity to oppose* the request. (*Watson*, at p. 299.) Further, that request must be timely made either before entry of judgment or, at the latest, within the time period for new trial motions under Code of Civil Procedure section 659. (*North Oakland*, at p. 831; *Watson*, at p. 298.)

76

Based on our review of the record on appeal, we conclude that Plaintiffs provided Defendants with both sufficient notice of their request for an award of section 3287(a) prejudgment interest and a reasonable opportunity to oppose their request. From the beginning of this action in 2016, Plaintiffs alleged that they were entitled to an award of interest on their section 7031(b) cause of action. Plaintiffs' complaint alleged that they had made 10 payments to Defendants, which totaled $2,732,627.87, and their second cause of action sought section 7031(b) reimbursement of all amounts paid to Defendants, "which amount is at least $2,732,627.87, *plus interest*." (Italics added.) Further, Plaintiffs' prayer for relief requested: *"prejudgment interest according to law*." (Italics added.)

On January 22, 2018, Plaintiffs served Defendants with their proposed judgment, which included a provision for an award of prejudgment interest as follows: "On the Second Cause of Action for Disgorgement of Contractor's Fees, the sum of $2,732,627.87, *plus prejudgment interest at the rate of 10% per annum* to the date hereof in the amount of $_____." (Italics added.) Together with their proposed judgment, Plaintiffs' counsel submitted a table setting forth the date and amount of each of the 10 payments made by Plaintiffs to M&C and provided the calculations for prejudgment interest through January 22, 2018 (i.e., $795,297.20) and the daily accrual amount (i.e., $748.66) until entry of the judgment.

Having received notice of Plaintiffs' request for an award of prejudgment interest in Plaintiffs' complaint and in their proposed judgment, Defendants had an opportunity to oppose, and did in fact oppose, Plaintiffs' request. Specifically, on February 1, 2018, Defendants opposed Plaintiffs' request for prejudgment interest by filing their objection to Plaintiffs'

77

proposed judgment, arguing that "the *judgment should not provide for any award of prejudgment interest* to Plaintiffs." (Italics added.)

On February 8, 2018, Plaintiffs responded to Defendants' opposition to their request for prejudgment interest and objections to their proposed judgment, arguing: "Plaintiffs are *entitled to an award of interest pursuant to . . . section 3287*" on their section 7031(b) claim. (Italics added.)

Based on the above pleadings, we conclude that Plaintiffs provided Defendants sufficient notice of their request for an award of section 3287(a) prejudgment interest and that Defendants had a reasonable opportunity to oppose that request, which is confirmed by Defendants' filing an opposition to that request. Further, Plaintiffs' request for section 3287(a) prejudgment interest was timely because it was made *before* entry of judgment on February 28, 2018. (*North Oakland*, *supra*, 65 Cal.App.4th at p. 831; *Watson*, *supra*, 2 Cal.App.5th at pp. 298-299.)

Even if we were to presume that Plaintiffs' prejudgment request for an award of section 3287(a) prejudgment interest was not sufficient to give Defendants notice of that request, we would nevertheless conclude that Plaintiffs' subsequent additional request after entry of the judgment provided Defendants sufficient notice of that request and a reasonable opportunity to oppose it. On February 28, 2018, the court entered a judgment for Plaintiffs, including a provision stating: "On the Second Cause of Action for Disgorgement of Contractor's Fees, the sum of $2,732,627.87, plus prejudgment interest at the rate of 10% per annum to the date hereof in the amount of $_____." On March 16, 2018, presumably because the judgment did not set forth the amount of prejudgment interest in the blank provided therefor, Plaintiffs filed a request for the court to add to its

78

February 28, 2018 judgment prejudgment interest in the amount of $822,998.51 through the date of that judgment.

We conclude that Plaintiffs' March 16, 2018 request for prejudgment interest was timely made, provided Defendants with sufficient notice of that request, and allowed Defendants a reasonable opportunity to oppose it. Plaintiffs' request was *timely* because it was filed within the time period for filing a motion for new trial. As with a motion for new trial, a request for prejudgment interest must be filed "[w]ithin 15 days of the date of mailing notice of entry of judgment by the clerk of the court . . . or service upon [Plaintiffs] by any party of written notice of entry of judgment, or within 180 days after the entry of judgment, whichever is earliest." (Code Civ. Proc., § 659, subd. (a)(2); *North Oakland, supra,* 65 Cal.App.4th at pp. 830-831; *Watson, supra,* 2 Cal.App.5th at pp. 298-299.) Our review of the record on appeal did not locate, and Defendants do not cite to, any notice of entry of the February 28, 2018 judgment that was served by either the superior court clerk or a party.[31] Therefore, the applicable period for a timely motion for new trial, and thus for a timely request for section 3287(a) prejudgment

_____

[31]    Further, the superior court's register of actions does not appear to contain a notice of entry of that judgment served by either its court clerk or a party. Although Plaintiffs state in their cross-appellants' opening brief that they served a notice of entry of judgment on March 16, 2018, they provide no citation to the record in support of that statement and our review of the record on appeal does not reflect any such notice of entry. Nevertheless, even if Plaintiffs had served a notice of entry on March 16, 2018, their request for an award of section 3287(a) prejudgment interest was filed on March 16, 2018, and was therefore timely filed within the 15-day period for filing new trial motions (i.e., on or before March 31, 2018). (Code Civ. Proc., § 659, subd. (a)(2).)

interest, is within 180 days after the entry of the judgment on February 28, 2018. (Code Civ. Proc., § 659, subd. (a)(2); *North Oakland*, at pp. 830-831; *Watson*, at pp. 298-299.) Because Plaintiffs' March 16, 2018 request for an award of section 3287(a) prejudgment interest was filed 16 days after the judgment was entered on February 28, 2018, their request was timely.

Further, Plaintiffs' March 16, 2018 request was sufficient because it provided Defendants and the trial court with the relevant information that Plaintiffs were requesting an award of section 3287(a) prejudgment interest. (*Watson*, *supra*, 2 Cal.App.5th at p. 299.) In particular, Plaintiffs' request, like the request in *Watson*, clearly identified the relief requested (i.e., the addition of prejudgment interest to the judgment amount) and the grounds on which that request was based (i.e., § 3287(a) and Plaintiffs' assertion that their § 7031(b) award was liquidated). (Cf. *Watson*, at p. 299.) Also, Plaintiffs' request, like the request in *Watson*, provided Defendants with a reasonable opportunity to oppose the request, as is evident from Defendants' written opposition filed with the court on April 23, 2018. We therefore conclude that Plaintiffs' request gave Defendants *sufficient notice* of their request for an award of section 3287(a) prejudgment interest and that Defendants had a *reasonable opportunity to oppose* that request, which is confirmed by Defendants' actual opposition to that request, filed on April 23, 2018. Accordingly, we conclude that the trial court erred in determining that Plaintiffs' additional request for an award of section 3287(a) prejudgment interest filed on March 16, 2018 was untimely and/or insufficient to provide Defendants with notice of Plaintiffs' request and a reasonable opportunity to oppose the request. As noted, contrary to the trial court's apparent belief and Defendants' argument, unlike a motion for new trial, no formal motion is required to request an award of section 3287(a) prejudgment interest.

(*Watson, supra,* 2 Cal.App.5th at p. 299.) To the extent that there is language in *North Oakland* that would support a contrary position, we disagree with it and decline to adopt it and instead conclude that the reasoning in *Watson* is more persuasive.[32]

E

Plaintiffs also contend that they are entitled to an award of prejudgment interest under section 3287(a) as matter of law because their section 7031(b) reimbursement award was certain or capable of being made certain by calculation. Plaintiffs' complaint alleged that they had made 10 payments to Defendants, which totaled $2,732,627.87, and their second cause of action sought section 7031(b) reimbursement of all amounts paid to Defendants. Their complaint specifically alleged the date and amount of each of those 10 payments. In support of Plaintiffs' motion for summary adjudication of their second cause of action against M&C, they submitted a separate statement of undisputed material facts, which asserted that

---

[32]    *North Oakland* stated that "requests for prejudgment interest under section 3287 by a successful plaintiff must be made by way of motion prior to entry of judgment, or the request must be made in the form of a motion for new trial no later than the time allowed for filing such a motion. (Code Civ. Proc., § 659.)" (*North Oakland, supra,* 65 Cal.App.4th at p. 831.) *Watson* subsequently declined to require a formal motion for a request for prejudgment interest, instead stating: "[T]he fact that Watson's request [for prejudgment interest] was not labeled as [a] motion for new trial or as a motion for modification under Code of Civil Procedure section 657 does not render its format defective. [Citations.]" (*Watson, supra,* 2 Cal.App.5th at p. 299.) As *Watson* noted, "[n]o statutes specify the timing or mechanism for seeking prejudgment interest" and "no rule of court specifies when prejudgment interest must be sought." (*Id.* at p. 297.)

81

Plaintiffs had paid M&C $2,732,627.87 for the construction of their home. In support of their opposition to the motion, Defendants submitted their separate statement that, in effect, admitted that Plaintiffs had paid Defendants that amount, stating: "Plaintiffs disbursed to M&C $2,732,627.87 for the materials supplied and services rendered during the construction of [Plaintiffs' home]." As discussed above, the trial court subsequently granted Plaintiffs' motion for summary adjudication, finding that Plaintiffs were entitled to section 7031(b) reimbursement from M&C in the amount of $2,732,627.87. The court thereafter entered the judgment awarding Plaintiffs $2,732,627.87 on their section 7031(b) reimbursement cause of action.

Based on the record, Plaintiffs' section 3287(a) reimbursement damages (i.e., $2,732,627.87) were clearly "certain, or capable of being made certain by calculation," within the meaning of section 3287(a). Specifically, Defendants knew, or should have known, the date and amount of each of Plaintiffs' 10 payments to M&C. An award of section 3287(a) prejudgment interest to Plaintiffs is therefore mandatory and not within the discretion of the trial court. (*North Oakland*, *supra*, 65 Cal.App.4th at p. 828 [under § 3287(a), "the court has no discretion, but must award prejudgment interest upon request."]; *Watson*, *supra*, 2 Cal.App.5th at p. 293 [same].)

F

Contrary to Defendants' argument, an award of section 3287(a) prejudgment interest is mandated on a section 7031(b) reimbursement award if the amount of reimbursement was certain or capable of being made certain by calculation. (§ 3287(a).) The purpose of section 3287(a) prejudgment interest is to "compensate[] the plaintiff for the loss of the use of property or

82

money during the period before the judgment is entered." (*Watson*, *supra*, 2 Cal.App.5th at p. 293.) Alternatively stated, "[f]rom a plaintiff's perspective, prejudgment interest compensates [the plaintiff] for the loss of use of the money during the period between the assertion of the claim and the rendition of judgment." (*Ibid*.) Section 3287(a) prejudgment interest is intended to compensate a plaintiff "*for loss of use of the award* during the prejudgment period." (*Lakin v. Watkins Associated Industries*, *supra*, 6 Cal.4th at p. 663, italics added.) Contrary to Defendants' assertion, section 3287(a) prejudgment interest is not limited to contractual or compensatory damages and their citation to *North Oakland*, *supra*, 65 Cal.App.4th at page 826, does not set forth any such limitation. Rather, as Plaintiffs note, section 3287(a) applies to causes of action arising in tort, contract, or otherwise, provided that the damages awarded were readily ascertainable. (*Wisper Corp. v. California Commerce Bank* (1996) 49 Cal.App.4th 948, 958 [§ 3287's "application to actions other than contract actions, such as tort actions, is well established"]; *Marine Terminals Corp. v. Paceco, Inc.* (1983) 145 Cal.App.3d 991, 995 [§ 3287(a) "allows recovery of prejudgment interest in causes of action other than contract. The crucial factor is . . . whether the damages were readily ascertainable"].) "When Civil Code section 3287 was 'adopted in 1872, the key distinguishing factor was not . . . whether the cause of action arose in tort or contract, but rather whether the damages were readily ascertainable.' [Citation.]" (*Wisper Corp.*, at p. 958, quoting *Levy-Zentner Co. v. Southern Pac. Transportation Co.* (1977) 74 Cal.App.3d 762, 795.) Section 3287(a) "has been applied consistently to allow the recovery of prejudgment interest in causes of action other than those in contract." (*Levy-Zentner Co.*, at p. 796.) There is nothing in the language of section 3287(a) that limits its provisions for prejudgment interest to only contract causes of

action.  Further, there is nothing in its language that precludes an award of prejudgment interest on section 7031(b) reimbursement awards.

Section 3287(a) generally provides that prejudgment interest must be awarded to "[a] person who is entitled to recover damages certain, or capable of being made certain by calculation . . . ."  Section 7031(b) provides that a person who uses an unlicensed contractor "may bring an action . . . to recover all compensation paid to the unlicensed contractor . . . ."  By providing for the recovery of all compensation paid, section 7031(b), in effect, allows a plaintiff to recover, as damages, all compensation paid to the unlicensed contractor. Therefore, the damages sought by a plaintiff under section 7031(b) consist of all compensation paid to an unlicensed contractor, which are sought to be recovered in a section 7031(b) reimbursement action.

To the extent that section 3287(a) prejudgment interest is arguably limited to cases in which compensatory damages are sought in a contract, tort, or other cause of action, a section 7031(b) reimbursement cause of action has been viewed as "fundamentally contractual in nature since it is based on an unlicensed contractor's agreement with the beneficiary to provide services, and the beneficiary's agreement to pay for same." (*Goldstein v. Barak Construction* (2008) 164 Cal.App.4th 845, 854.)  Because a section 7031(b) plaintiff seeks compensatory damages in the form of reimbursement for all compensation paid to an unlicensed contractor pursuant to an express written or oral contract or an implied construction agreement, that plaintiff is entitled to an award of prejudgment interest under the express provisions of section 3287(a) if the plaintiff shows that those compensatory damages were certain or capable of being made certain by calculation.  Contrary to Defendants' apparent assertion, we discern no inconsistency in viewing a section 7031(b) award as compensatory damages while also viewing such an

award as a statutory penalty, as discussed in part V above. (See, e.g., *MW Erectors, supra*, 36 Cal.4th at pp. 418, 423, 425; *Hydrotech*, *supra*, 52 Cal.3d at pp. 995, 997; *Alatriste*, *supra*, 183 Cal.App.4th at pp. 666-667.) Rather, we conclude that a section 7031(b) reimbursement award is properly, and consistently, viewed as both an award of compensatory damages based on the amount of compensation paid to an unlicensed contractor *and* a statutory penalty imposed against an unlicensed contractor based on section 7031(b)'s public policy purpose of deterring violations of contractor licensing laws. (*MW Erectors,* at pp. 418, 423, 425; *Hydrotech*, at pp. 995, 997; *Alatriste*, at pp. 666-667.) Defendants do not cite any case in support of their assertion or otherwise persuade us to reach a contrary conclusion. Further, contrary to Defendants' assertion, an award of section 3287(a) prejudgment interest on a section 7031(b) reimbursement award would *not* constitute "punitive damages," but instead, is compensation for the loss of the use of that money paid to an unlicensed contractor from the time of payment through the date of the judgment.

G

The legislative intent underlying section 7031(b) also supports a plaintiff's entitlement to prejudgment interest under section 3287(a). As discussed above, the Legislature intended that section 7031(a) and section 7031(b) be interpreted in a consistent manner so that the same remedy applies regardless of whether the unlicensed contractor is the plaintiff or defendant. (*White, supra*, 178 Cal.App.4th at pp. 519-520; see also *Alatriste, supra*, 183 Cal.App.4th at p. 666.) The Legislature therefore intended that a section 7031(b) plaintiff be placed in as good a position as a section 7031(a) defendant. A section 7031(a) defendant uses that statute as a shield, preventing an unlicensed contractor from obtaining compensation for services

85

performed or materials provided that require a contractor's license. As a result, a section 7031(a) defendant naturally will not suffer any loss of the use of money from the time those services were performed or materials provided through the date of the judgment and therefore, would have no need for an award of section 3287(a) prejudgment interest. (Cf. *Watson*, *supra*, 2 Cal.App.5th at p. 293.)

In contrast, a section 7031(b) plaintiff necessarily will have suffered a loss of the use of money from the time the plaintiff paid an unlicensed contractor for services or materials through the date of the judgment. Regardless of the length of that time period (e.g., months or years), there is a "time-value" to that money during the period that the unlicensed contractor retains that money and the plaintiff has lost use of that money. In order to place a section 7031(b) plaintiff in the same position as a section 7031(a) defendant, as the Legislature intended, a section 7031(b) plaintiff should be compensated for the loss of the use of the money paid to an unlicensed contractor by an award of prejudgment interest on the amount of a section 7031(b) reimbursement award.

Accordingly, an award of section 3287(a) prejudgment interest on a section 7031(b) reimbursement award carries out the legislative intent underlying section 7031(b). To deny a section 7031(b) plaintiff prejudgment interest would have the practical effect of treating section 7031(a) defendants and section 7031(b) plaintiffs disparately and would, in effect, deprive section 7031(b) plaintiffs of the same remedy that section 7031(a) defendants have. (*White*, *supra*, 178 Cal.App.4th at pp. 519-520; *Alatriste*, *supra*, 183 Cal.App.4th at p. 666.) Further, if the Legislature had intended to disallow a section 3287(a) prejudgment interest award for section 7031(b) plaintiffs, we presume that it would have expressly so provided. "The Legislature is

86

presumed to be aware of existing laws . . . when it enacts legislation." (*Alatriste*, at p. 670.)  Because the Legislature did not do so, we conclude that it intended section 7031(b) plaintiffs to recover section 3287(a) prejudgment interest on section 7031(b) reimbursement awards.  (Cf. *Alatriste*, at p. 670.)

## DISPOSITION

The order dated August 3, 2018, granting in part Plaintiffs' motion for attorney fees under section 1029.8, and the order dated November 9, 2018, denying Plaintiffs' request for prejudgment interest under section 3287(a), are reversed.  In all other respects, the judgment and orders are affirmed. The matter is remanded with directions that the superior court issue a new order denying Plaintiffs' motion for an award of section 1029.8 attorney fees and granting their request for an award of section 3287(a) prejudgment interest and enter a new judgment consistent with this opinion.


AARON, J.

WE CONCUR:



HUFFMAN, Acting P. J.



GUERRERO, J.